**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RIVERKEEPER, INC. and SAVE THE SOUND, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL EXPRESS LLC, and WHITE PLAINS BUS CO., INC., <br><br> Defendants. | Case No.  7:24-cv-09676 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

Plaintiffs Riverkeeper, Inc. ("Riverkeeper") and Save the Sound, Inc. ("Save the Sound") (collectively, "Plaintiffs"), by and through their counsel, hereby allege:

**I.**

**INTRODUCTION**

1. This is a civil suit brought under the under the citizen suit enforcement provision (33 U.S.C. § 1365) of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or the "Act"), to address and abate the above-named Defendants' longstanding, ongoing, and continuous violations of the Act.

2. Defendants discharge polluted stormwater runoff from their vehicle and equipment maintenance and storage facilities, located in White Plains, New York (collectively, referred to as the "Facilities") into waters of the United States—specifically, the Bronx River—in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-23-001 (March 8,

2023) ("General Permit") and the prior version of that permit.

3.     Defendants' violations of the General Permit and the Clean Water Act include, *inter alia*: (i) insufficient pollution control measures; (ii) causing or contributing to violations of New York State water quality standards for dissolved oxygen in Class C waters; (iii) failures to take required corrective actions in response to excessive levels of pollution in laboratory samples of Defendants' stormwater discharges and Defendants' own visual observations of polluted stormwater; (iv) legally inadequate stormwater pollution prevention plans; (v) failures to comply with the General Permit's inspection, monitoring, recordkeeping, and reporting requirements; and (vi) discharging pollutants to the Bronx River without permit authorization.

4.     Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from factories and sewage plants. With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into New York Harbor, Long Island Sound, the East River, their tributaries including the Bronx River, and other receiving waters in this district.  Defendants' unlawful stormwater discharges contribute to this endemic stormwater pollution problem.  Contaminated stormwater discharges such as those from the Facilities can and must be controlled to the fullest extent required by law in order "to restore and maintain the chemical, physical, and biological integrity" of these waterbodies.  *See* 33 U.S.C. § 1251(a) (Congressional declared objective of the Clean Water Act).

## II.

### JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.      On October 16, 2024, Plaintiffs provided notice of Defendants' violations of the Act and of their intention to file suit against Defendants National Express LLC and White Plains Bus Co., Inc. to the Defendants; the registered agent for White Plains Bus Co., Inc.; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 2; and the Commissioner of the New York State Department of Environmental Conservation ("DEC"), pursuant to CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3 (the "Notice Letter").  National Express LLC does not have a registered agent listed on the New York Department of State, Division of Corporations, public inquiry webpage.  https://apps.dos.ny.gov/publicInquiry/.  A true and correct copy of Plaintiffs' Notice Letter is attached as Exhibit A to this complaint and is incorporated herein by reference.

7.      More than sixty days have passed since the Notice Letter was served on Defendants and the federal and state agencies.  Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

8.      Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

9.      This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

10.     Venue is proper in the United States District Court for the Southern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

11.    Plaintiff RIVERKEEPER, INC. is a non-profit corporation, existing under the laws of the state of New York, headquartered in Ossining, New York.  Riverkeeper protects and restores the Hudson River from source to sea and safeguards drinking water supplies, through advocacy rooted in community partnerships, science and law.  Riverkeeper achieves its mission through public education, advocacy for sound public policies, and participation in legal and administrative forums.

12.    Riverkeeper has more than 3,800 members, many of whom reside near, use, and enjoy the Bronx River and the East River for recreational, aesthetic, conservational, educational, and commercial purposes including to fish, sail, boat, kayak, swim, birdwatch, photograph, engage in spiritual contemplation, view wildlife, and engage in nature study and scientific study, among other activities.

13.    For example, one Riverkeeper member who lives in the Bronx participates in an annual paddle down the entire Bronx River and also enjoys boating with friends and observing wildlife in the lower Bronx River and near the mouth of the Bronx River where it empties into the East River.  In addition to recreational activities, this member's professional activities and responsibilities also involve the Bronx River.  This member oversees educational and experiential programs for students in the South Bronx, which involves regular contact with the Bronx River for water quality testing and wildlife monitoring.  This member frequently observes water pollution accumulating in the water and in wetlands from stormwater runoff from streets and parking lots adjacent to the Bronx River during and after rain events.  This member is concerned about the health risks associated with primary contact with water pollution and is not

comfortable being exposed, or exposing students, to the Bronx River after rain events due to increased levels of pollution in stormwater runoff.  Stormwater pollution in the Bronx River prevents this member from using and enjoying the Bronx River for recreational and professional purposes.  This member's enjoyment of the Bronx River for recreational, professional, and aesthetic purposes is also harmed by the unpleasant smells caused by pollution, potential health effects caused by pollution in the Bronx River, and fish die-offs caused by pollution in the Bronx River.  This member is thus harmed in many ways by Defendants' polluted discharges of stormwater from the Facilities.  Improving the water quality of the Bronx River through full compliance with the Clean Water Act at Defendants' Facilities would benefit this member.

14.    Plaintiff SAVE THE SOUND, INC. is a not-for-profit environmental organization incorporated under the laws of the State of Connecticut, with a principal place of business in New Haven, Connecticut, and a New York office located in Larchmont, New York.  Save the Sound's primary purpose is to conserve and enhance the biological integrity of the Long Island Sound region's air, land, and water resources, including Long Island Sound, its tributaries, and watershed.  Save the Sound uses legal and scientific expertise, advocacy, and education in furtherance of its purpose to achieve results that benefit the environment for current and future generations.

15.    Save the Sound represents over 4,400 member households, many of whom use and enjoy Long Island Sound and its tributary rivers and streams, including the Bronx River and East River, for swimming, boating, fishing, birding and wildlife viewing, photography, spiritual reflection, nature, scientific study, and other activities.

16.    For example, one Save the Sound member who since 2018 has resided less than one mile from each of the Facilities—approximately halfway between the two—regularly walks,

jogs, sits and reads, and watches wildlife along the Bronx River in the Bronx River Parkway Reservation. This member visits the recreational trail along the Bronx River several days a week as both a fitness opportunity and to enjoy a piece of nature within an otherwise densely urbanized area. This member does not have a backyard at home, so the reservation is particularly special to this member as a place to enjoy nature within walking distance from home. This member sometimes notices chemical or sewage-like smells coming from the Bronx River which interfere with this member's ability to enjoy the aesthetic value of the Bronx River. Because of this member's aesthetic and recreational interests in the Bronx River, this member is deeply concerned about the Bronx River's water quality and frequently engages in related advocacy. For example, this member regularly attends public hearings on local land use decisions to advocate for the consideration of water quality and stormwater management issues. This member also began fishing a few years ago, has a fishing permit, and would like to be able to fish in the Upper Bronx River, particularly near home in White Plains and downstream where the member has heard of good fish habitat. But this member does not do so because the member understands that the water quality is not suitable for safe consumption of fish from the Bronx River. If the water quality improved, this member would enjoy fishing in the Bronx River. This member also would like to be able to wade or swim in the Bronx River, but again only if the water quality improved to a point where doing so would be safe. This member intends to continue living in this area and recreating on the Bronx River for the foreseeable future, but the sub-standard water quality and odors are impeding this member's ability to enjoy doing so. This member is thus harmed by polluted discharges of stormwater from the Facilities and would benefit from improved water quality resulting from Defendants' compliance with the Clean Water Act.

17.    Defendants' discharges of stormwater associated with industrial activity containing pollutants adversely affect the interests of Plaintiffs' members.  The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs and their members, for which harm they have no plain, speedy, or adequate remedy at law.

18.    Plaintiffs are informed and believe, and thereupon allege, that Defendant NATIONAL EXPRESS LLC is a limited liability company, formed and existing under the laws of New York and registered to do business in New York State (NYS DOS ID 5301918). National Express LLC is the entity most often identified as the owner and operator of the Facilities on the notices of intent to be covered under the General Permit filed with DEC.  Those notices give 2601 Navistar Drive Lisle, IL 60532 as National Express LLC's address.

19.    Plaintiffs are informed and believe, and thereupon allege, that Defendant WHITE PLAINS BUS CO., INC. is a corporation formed and existing under the laws of New York and registered to do business in New York State (NYS DOS ID 27263).  White Plains Bus Co., Inc. has also been identified as the owner and operator of the Facilities on the notices of intent to be covered under the General Permit filed with DEC.  Those notices give 14 Fisher Lane, White Plains, NY 10603, and 91 Fulton Street, White Plains, NY 10606, as the addresses for White Plains Bus Co., Inc.  White Plains Bus Co., Inc. has a registered agent in New York and is a subsidiary of National Express LLC.

**IV.**

**STATUTORY AND REGULATORY BACKGROUND**

**The Clean Water Act**

20.    Congress enacted the Clean Water Act in 1972 to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

21.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, or a permit issued pursuant to Section 404 of the Act, 33 U.S.C. § 1344.  A NPDES permit requires dischargers of pollution to comply with various limitations.

22.     NPDES permits are issued by EPA or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

23.     In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued NPDES permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

24.     The Clean Water Act requires all state-issued NPDES permits to apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. §§ 1311, 1316, and other sections).

25.     The Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology

economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ." 33 U.S.C. § 1311(b)(2)(A) (*i.e.*, the "BAT" standard). The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants."[1] *Id.* § 1311(b)(2)(E) (*i.e.*, the "BCT" standard) (together, the "BAT/BCT Standard"). *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

26. The Clean Water Act further requires any state-issued NPDES permit to contain any additional limits necessary to ensure compliance with that state's water quality standards. *See* 33 U.S.C. § 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards"); *id.* § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311 and other sections). *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

## Stormwater Permits

27. In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

28. Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

29. In promulgating those regulations, EPA cited abundant data showing the harmful

---

[1] "Conventional pollutants" are defined by statute, 33 U.S.C. § 1314(a)(4), and by regulation, 40 C.F.R. § 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

30.    CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

31.    40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

32.    40 C.F.R, § 122.26(b)(13) defines "storm water" to include "storm water runoff, snow melt runoff, and surface runoff and drainage."

33.    40 C.F.R. § 122.26(b)(14)(viii) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") Major Groups 41 and 42, which include transportation facilities with vehicle maintenance shops.

### New York's General Permit for Discharges of Stormwater Associated with Industrial Activity

34.    As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  The current General Permit came into effect in March 2023 and is available at https://dec.ny.gov/docs/water_pdf/gp023001final03082023.pdf.

35.    The prior version, New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial

Activity, Permit No. GP-0-17-004 (March 1, 2018) ("2018 General Permit"), was in effect from March 1, 2018, to February 28, 2023.  Hereinafter, unless otherwise indicated, the current General Permit and the 2018 General Permit are referred to collectively as the "General Permit."

36.    As a state-issued NPDES permit, the General Permit requires permittees to comply with federal technology-based standards.  The General Permit requires permittees to use measures that reflect—and prohibits the discharge of pollutants above the level commensurate with—application of the BAT/BCT Standard.  *See* General Permit, Part II (requiring permittees to minimize pollution) and Appendix A (defining "minimize" as "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in the light of best industry practice").

37.    DEC's use of the term "minimize" to reflect the BAT/BCT Standard follows EPA's longstanding practice.  *See* United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit (MSGP) For Stormwater Discharges Associated With Industrial Activity Fact Sheet (2021) at 32 ("Consistent with the control level requirements of the CWA, since 2008 for purposes of the MSGP EPA has defined the term 'minimize' as 'for the purposes of this permit minimize means to reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practices.'"); EPA, Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) – Fact Sheet (2008) at 34 ("Consistent with the control level requirements of the CWA, EPA is clarifying in this permit that the term 'minimize' means to reduce and/or eliminate to the extent achievable using control measures (including best management practices) that are technologically available and economically achievable (BAT)

11

and practicable (BPT) in light of best industry practice.  EPA has determined that the technology-based numeric and non-numeric effluent limits in this permit, taken as a whole, constitute BPT for all pollutants, BCT for conventional pollutants, and BAT for toxic and nonconventional pollutants that may be discharged in industrial stormwater.").

38.    As a state-issued NPDES permit, the General Permit also prohibits permittees from causing or contributing to violations of water quality standards.  *See* 2023 General Permit Part II.C.1.a ("It must be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705."); *see also* 2018 General Permit Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700-705.").

### The General Permit's Framework

39.    The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the CWA's citizen suit provision.  33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title").

40.    At the outset, the General Permit establishes eligibility conditions that permittees must meet to obtain coverage.  General Permit, Part I.  Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent ("NOI").  General Permit, Part I.D.  The General Permit requires that, when submitting an NOI, the applicant provide information on any and all industrial activities that occur at the facility and are listed in

Appendix B to the General Permit.

41.    Under the General Permit, a permittee may lawfully discharge only stormwater associated with its disclosed industrial activity and only from its identified outfalls.  General Permit, Parts I.D.3 ("Stormwater discharges from industrial activities or outfalls not included in previously submitted NOIs are not authorized until a complete NOI is received."); *see also* 6 NYCRR § 750-1.2(a)(29) ("Discharges authorized by a SPDES permit means discharges of wastewater or stormwater from sources listed in the permit, that do not violate ECL section 17-0501, that are through outfalls listed in the permit, and [meet other requirements].").

42.    Very limited categories of non-stormwater discharges are eligible for coverage under the General Permit.  *See* General Permit, Part I.B.2 (referring to non-stormwater discharges listed in 6 NYCRR § 750-1.2(a)(29)(vi)).  Other discharges, including process wastewater or direct discharges or spills of industrial materials, such as sand and gravel, are not eligible for coverage under the General Permit and would require an application for and issuance of an individual NPDES/SPDES permit, or another appropriate CWA permit, in order to be authorized.  *See* General Permit, Part I.C.

43.    Next, the General Permit contains a variety of substantive limits that all permittees must meet.  General Permit, Part II.  These include numeric effluent limitations on the quantity and concentration of pollutants (for some facilities), non-numeric technology-based effluent limitations on pollutants, water quality-based effluent limitations, and compulsory pollution control and minimization practices.  General Permit, Parts IIA–II.D.

44.    The General Permit sets forth specific non-numeric technology based effluent limits in the form of required Best Management Practices ("BMPs") for all facilities.  General Permit, Parts II.A.1-A.12.

45.    In addition, the General Permit contains additional effluent limitations that apply only to permittees engaged in particular industrial activities.  General Permit, Part VII.

46.    Permittees with more than one industrial activity occurring at their site are required to comply with all conditions of the General Permit pertaining to any other industrial activities occurring at their facility too, referred to as "co-located" activities.  All of the SWPPP and sector-specific permit requirements for each of those co-located activities apply.  General Permit, Part VII.

47.    Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting BMPs and other stormwater control measures.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).

48.    The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  *See, e.g.*, General Permit, Part II (outlining mandatory BMPs), Part VII (outlining sector-specific BMPs), Part III.A.7 (requiring documentation of all BMPs installed and implemented at the facility pursuant to Parts II and VII, documentation of all innovative BMPs, and an explanation of any BMPs that have not been installed due to site-specific conditions).

49.    A permittee must record the BMPs and control measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  General Permit, Part

III. The permittee must develop, implement, and continually update this plan to adapt it to changing conditions at the facility. *Id.* The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the General Permit. *Id*. Further, the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the General Permit. General Permit, Part I.D.1.a(1).

50. To ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs, permittees must track, improve upon, and report upon their performance under the General Permit. *See* General Permit, Parts IV–VII.

51. The General Permit requires regular inspections by qualified personnel, including annual comprehensive inspections and quarterly routine inspections, to evaluate the performance and maintenance needs of BMPs, detect leaks, and document any deficiencies in the implementation and/or adequacy of the SWPPP, amongst other things. General Permit, Parts IV.A–C; *see also id.* Parts II.A.2–3.

52. The General Permit also requires monitoring of stormwater discharges, including quarterly visual monitoring and periodic sampling for pollutants associated with the facility's industrial sector. General Permit, Parts IV.D–G, VII.

53. The General Permit relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (a/k/a "benchmarks") for each pollutant to ensure that permittees are minimizing pollution and complying with the narrative limits set forth in the General Permit. *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

54. A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters."

General Permit, Appendix A (defining "benchmark monitoring cut-off concentrations"). As EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995). Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing, water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

55. Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements. Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988); *see also Pub. Interest Research Grp., Inc. v. GAF Corp.*, 770 F. Supp. 943, 953–54 (D.N.J. 1991) (citing *Garner v. United States*, 424 U.S. 648, 665 (1976); *United States v. Ward*, 448 U.S. 242, 254 (1980) ("It is well established that records required to be kept by law, such as DMRs, may be deemed to be admissions for purposes of establishing civil liability.").

56. If an inspection or monitoring sample reveals an exceedance, violation, or other issues with the BMPs or the SWPPP, the permittee is required to take and document corrective actions. General Permit, Part V.

57. The results of a permittee's inspections and monitoring must be documented and kept with the SWPPP, and certain reports must be submitted to DEC on a periodic basis. General Permit, Part VI. This self-reporting is the primary means by which regulators and citizens can ensure that a facility complies with the General Permit and the Clean Water Act.

*See Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1115 (4th Cir. 1988) ("[R]eporting and records retention requirements of the NPDES permit . . . are central to adequate administration and enforcement of limits on substantive discharges under the Clean Water Act.  Unless a permit holder monitors as required by the permit, it will be difficult if not impossible for state and federal officials . . . to know whether or not the permit holder is discharging effluents in excess of the permit's maximum levels.  Congress has provided that these records be made generally available . . . to the Administrator [and] the public. . . .").

### **Pertinent Conditions of the General Permit**

58.     Within that framework, and without limiting the general applicability of the foregoing, the following specific conditions of the General Permit are particularly pertinent to this case.

### Benchmark Cutoff Concentrations

59.     For facilities in Sector P, the General Permit establishes the following Benchmark Monitoring Cut-off Concentrations: Oil & Grease – 15 mg/L; Chemical Oxygen Demand (COD) – 120 mg/L; Benzene – 50 ug/L; Ethylbenzene – 50 ug/L; Toluene – 50 ug/L; Xylene – 50 ug/L. 2023 Permit, Table VII-P-1.

### Violating Water Quality Standards

60.     The General Permit prohibits discharges that either cause or contribute to a violation of the New York State water quality standards set forth in 6 NYCRR Parts 700–705. General Permit Part II.C.1.a.

### Corrective Actions

61.     Corrective actions are required when benchmarks are exceeded, visible pollution is observed, a facility's discharges may cause or contribute to water quality standard violations,

17

or site inspections indicate the presence of stormwater pollution.

62.    General Permit, Part V.A requires corrective actions when "[i] the quarterly visual monitoring indicates the presence of pollution or [ii] when the benchmark or numeric effluent limitation monitoring sample results indicate exceedances of the pollutants."

63.    General Permit, Part II.C.1.b requires corrective actions if there is evidence indicating that stormwater discharges "are causing, have the reasonable potential to cause, or are contributing to a violation of the water quality standards."

64.    General Permit, Part V requires corrective actions when a "comprehensive site compliance inspection . . . indicates the presence of stormwater pollution (e.g., color, odor, floating solids, settled solids, suspended solids, foam, oil sheen, or other indicators)."

65.    Required corrective actions include, *inter alia*, inspecting the facility for potential sources of stormwater contamination; implementing additional non-structural and/or structural BMPs to address any identified sources of contamination within specified timeframes to prevent recurrence; and revising the SWPPP in accordance with Part III.E of the General Permit. General Permit, Parts V.A.1-3.

66.    If there is an event that triggers corrective actions at an outfall that represents other substantially identical outfalls, corrective actions must be completed for all outfalls covered by a Representative Outfall Waiver.  General Permit, Parts V and IV.G.3.d.

67.    The implementation of corrective actions must be completed before the next anticipated storm event, if practicable, but not more than 12 weeks after discovery (unless specific written approval for a longer schedule has been granted by DEC).  General Permit, Parts V.A.2.a-b

68.    If benchmark exceedances or visual observations of pollution continue after

implementing corrective actions, the discharger must continue implementing additional BMPs until satisfactory results are achieved with respect to visual monitoring and benchmark monitoring.  General Permit, Part V.A.4.

69.    Permittees must document the existence of conditions requiring corrective actions within 24 hours of becoming aware of such condition and must keep the corrective action documentation listed in Part V.C.a-e of the General Permit with their SWPPP.  General Permit, Part V.C.  This includes, *inter alia*, a description of the condition triggering the need for corrective action, the dates when the condition was identified and the corrective action is expected to be completed, and a description of the corrective actions.  *Id.*

70.    Corrective action forms must be signed and certified in accordance with Appendix G.10 of the General Permit—meaning, *inter alia*, that a duly authorized representative must certify under penalty of law that that it is true, accurate, and complete.  General Permit, Part V.C.e & Appendix G.10; *see also* 2018 General Permit, Part V.C.e & Appendix H.8.

71.    A failure to timely implement and document the necessary corrective actions is a violation of the General Permit.  General Permit, Parts V and II.C.1.b.

<u>Pollution Control Measures</u>

72.    The General Permit describes twelve categories of BMPs and other control measures that permittees must implement in the first instance to comply with the BAT/BCT Standard, and must improve and supplement when corrective actions are required:  (1) Minimize Exposure; (2) Good Housekeeping; (3) Maintenance; (4) Spill Prevention and Response Procedures; (5) Erosion and Sediment Controls; (6) Management of Runoff; (7) Salt Storage Piles or Piles Containing Salt; (8) Employee Training; (9) Non-Stormwater Discharges; (10) Waste, Garbage and Floatable Debris; (11) Dust Generation and Vehicle Tracking of Industrial

Materials; and (12) Secondary Containment.  General Permit, Parts II.A.1–12.

73.     Additional sector-specific BMPs for land transportation facilities are set forth in General Permit, Part VII (Sector P).

74.     Permittees must apply nine BMP selection and design considerations when selecting and designing BMPs to minimize stormwater pollution discharges and must document their consideration of BMPs, using the selection and design criteria, in the SWPPP.  General Permit, Part I.D.

The SWPPP

75.     The General Permit requires that all facilities must develop, implement, update, and modify (as needed) a SWPPP in accordance with general requirements and sector-specific requirements.  General Permit, Parts I.D.1.a(1), III.

76.     As described in Parts III.A.2 and III.A.6 of the General Permit, the SWPPP must describe and include a detailed map of the facility showing, *inter alia*, its drainage areas, stormwater flows, stormwater conveyances, and industrial areas that are exposed to stormwater. Additional requirements for the site map for land transportation facilities are set forth in General Permit, Part VII (Sector P).

77.     As described in Part III.A.3 of the General Permit, the SWPPP must identify and describe in detail the potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity or activities.

78.     Further, the SWPPP must describe and document the location of the BMPs that have been implemented to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  General Permit, Part III.A.7.

20

79.    The SWPPP must address, at a minimum, each of the universally applicable elements set forth in Part III.A of the General Permit, and each of the applicable sector-specific plan elements specified in Part VII of the General Permit, *see* Part III.A.7.  Each of these elements also requires the discharger to maintain records and documentation of compliance with each of these elements.

80.    The SWPPP must be representative of current site conditions and kept up to date.  General Permit, Part III.E.  The SWPPP must also be revised to reflect corrective actions. *Id*.; *see also* General Permit, Parts V.A.3 and V.A.11.

81.    The SWPPP must be signed and certified in accordance with Appendix G.10 of the General Permit—meaning, *inter alia*, that a duly authorized representative must certify under penalty of law that it is true, accurate, and complete.  General Permit, Part III.C.1 & Appendix G.10; *see also* 2018 General Permit Part III.C.1 & Appendix H.8.

82.    The SWPPP must be retained on-site at the facility and made available, upon request, to the public.  General Permit, Parts III.C.1 and II.C.2.c.

<u>Inspection, Monitoring, Recordkeeping, and Reporting</u>

83.    To ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs, permittees must perform self-inspections and closely monitor and report upon their performance under the General Permit.  *See* General Permit, Parts IV, VI.

84.    The General Permit's inspection and monitoring requirements include: an annual comprehensive site compliance inspection and evaluation; routine inspections of BMPs; an annual dry weather flow inspection; "benchmark monitoring," *i.e.*, collection and laboratory analysis of stormwater samples for comparison with benchmarks at least semi-annually; and quarterly visual monitoring *i.e.*, collection and visual examination of stormwater for the presence

of pollution.  General Permit, Part IV.A–F.  Limited monitoring waivers may be available, but only if certain preconditions are met.  General Permit, Part IV.G and Tables IV.1 and IV.2 (frequency and timing of monitoring).

85.    The General Permit requires permittees to retain records of all monitoring information for at least five years.  General Permit, Part VI.B; *see also id*., Part III.A.8–12 (monitoring information to be kept with the SWPPP).

86.    The General Permit requires permittees to submit to DEC an Annual Certification Report (ACR), Discharge Monitoring Reports (DMRs) for benchmark monitoring, and additional reports.  General Permit, Part VI.A.1–3.

### CWA Citizen Enforcement Suits

87.    Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

88.    Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of any condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

89.    Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

90.    Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

91.    Violators of the Clean Water Act are also subject to an assessment of civil penalties of up to $66,712 per day per violation.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d),

1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### The Facilities, Stormwater Discharges, and Receiving Surface Waters

92. Defendants operate two vehicle and equipment storage and maintenance facilities in White Plains, New York—the Fisher Facility (14 Fisher Lane, White Plains, NY 10603) and the Fulton Facility (91 Fulton Street, White Plains, NY 10606)—where industrial activities, including vehicle fueling and vehicle and equipment maintenance and cleaning, occur. Defendants' industrial operations, vehicles, equipment, and materials are exposed to stormwater flows at the Facilities.

93. Defendants have operated the Facilities since at least February 3, 2017, the date on which they first signed and certified NOIs to be covered under the General Permit at the Facilities. On those NOIs, as well as the NOIs it submitted to DEC in 2018 and 2023, Defendants identified the Facilities' primary Standard Industrial Classification (SIC) code as 4151 (School Buses) in the 4111–4173 (Local and Highway Passenger Transportation) range of SIC codes. (A "primary" SIC code is the four-digit SIC code that best describes the primary industrial activities occurring at a facility).

94. Under the General Permit, facilities with a primary SIC code of 4151 are assigned to the Land Transportation and/or Warehousing sector, also referred to as Sector P in the General Permit. General Permit, Appendix B – Sectors of Industrial Activity Covered by the Permit, Part VII, Sector P – Land Transportation and/or Warehousing.

95. In 2023, Defendants identified SIC code 4131 (Intercity and Rural Bus Transportation) as a secondary applicable SIC code, in relation to one outfall at the Fisher

Facility.  Facilities in SIC code 4131 are also in Sector P and subject to the same requirements as those in SIC code 4151.

96.    Defendants have vehicle and equipment maintenance shops and equipment cleaning operations at both Facilities.  Defendants' SWPPP states that Defendants operate a fleet maintenance shop for gasoline and diesel-powered buses and paratransit vans at the Fisher Facility.  Defendants' SWPPP states that the Fulton Facility is utilized for bus maintenance, fueling, and parking.

97.    The Fisher Facility is approximately 2 acres and, according to Defendants' SWPPP, maintains approximately 187 vehicles (42 school buses, 125 vans, and 20 cars). Vehicle fueling and parking/storage, including storage of vehicles and equipment awaiting maintenance, occur outside not under cover.

98.    The Fisher Facility has an outside fueling island with underground fuel tanks. There are also dumpsters exposed to precipitation and used tires are stored outside.

99.    While vehicle maintenance at the Fisher Facility is typically conducted inside, the maintenance building and Defendants' practices are not sufficient to contain pollutants from vehicle maintenance and cleaning activities from escaping the building via track-out on tires, roof vents or other openings in the building, and open bay doors, where they are exposed to precipitation and carried away in stormwater flows.

100.    Defendants store new and used motor oil, used batteries, and other liquid and solid wastes, including scrap metal, in the maintenance building at the Fisher Facility.

101.    Defendants also conduct equipment cleaning outside not under cover at the Fisher Facility.

102.    Defendants wash buses in a bus wash bay at the Fisher Facility, which is intended

to capture wash water and discharge it to the sanitary sewer.

103.    Potential pollution sources at the Fisher Facility include but are not limited to the maintenance building, fueling island, vehicles, equipment, storage areas for vehicles and equipment awaiting maintenance, parking areas, loading/unloading areas, dumpsters and waste storage areas, fuel storage areas and tanks, and the bus wash bay.

104.    Defendants' SWPPP states that the Fisher Facility is almost entirely (99%) paved with impervious surfaces, has a runoff co-efficient of 99%, is within the City of White Plans Municipal Separate Stormwater System ("MS4") area, and has several stormwater drains on the premises.

105.    The site map in Defendants' SWPPP indicates that the Fisher Facility's maintenance building has a trench drain, but does not indicate where the drain flows to.

106.    The Fulton Facility is approximately one-half acre.  Fueling and vehicle storage, including storage of vehicles and equipment awaiting maintenance, occur outside not under cover.

107.    The Fulton Facility has an outside fuel pump with an underground fuel tank.

108.    While vehicle maintenance at the Fulton Facility is typically conducted inside, the maintenance building and Defendants' practices are not sufficient to contain pollutants from vehicle maintenance and cleaning activities from escaping the building via track-out on tires, roof vents or other openings in the building, and open bay doors, where they are exposed to precipitation and carried away in stormwater flows.

109.    Defendants store new and used motor oil in the maintenance building at the Fulton Facility.

110.    Defendants also conduct equipment cleaning outside at the Fulton Facility.

111.    Defendants' SWPPP states that there is no bus washing performed onsite at the Fulton Facility.

112.    Potential pollution sources at the Fulton Facility include but are not limited to the maintenance building, fuel pump, vehicles, equipment, storage areas for vehicles and equipment awaiting maintenance, parking areas, loading/unloading areas, dumpsters and waste storage areas, fuel storage areas and tanks, and any unpaved areas covered with gravel.

113.    Section 1.1 of Defendants' SWPPP states that the Fulton Facility "consists of approximately 99% impervious surfaces," and is within the City of White Plans MS4 area. However, Section 6.2.6 of Defendants' SWPPP states that "[m]ost of the exterior grounds of the [Fulton] Facility consist of unpaved (gravel) and grassy areas." And Section 6.1 of Defendants' SWPPP states that a stormwater control measure "evaluated and implemented where possible at this Facility" is "[m]inimizing impervious areas at the [Fulton] Facility."

114.    Industrial activity at the Facilities takes place outdoors, where pollutants are exposed to stormwater that discharges into the Bronx River, specifically into the segment of the Bronx River identified by DEC as "Bronx River, Upper, and tribs" (Segment ID 1702-0107) (referred to herein as the "Upper Bronx River").

115.    Stormwater flowing over the Facilities collects and carries away pollutants that discharge through multiple outfalls at the Facilities and into the Bronx River through the City of White Plains MS4 system. Defendants discharge stormwater associated with industrial activity from the Facilities through multiple outfalls through the City of White Plains MS4 system to the Bronx River.

116.    Defendant certified in 2018 and 2023 that there are three outfalls at the Fisher Facility—Outfall Nos. 001, 002, and 006—and only one outfall at the Fulton Facility—Outfall

No. 001.  Previously, in 2017, Defendants had identified only two outfalls at the Fisher Facility.

117.    The Upper Bronx River includes the Bronx River and its tributaries above the Bronx-Westchester county line.  *See* DEC, Bronx River, Upper, and tribs, (Segment ID 1702-0107), Waterbody Segment Assessment Factsheet Based on the 2021 CALM, Revised: December 07, 2021, available at: https://extapps.dec.ny.gov/data/WQP/PWL/1702-0107.htmlDEC has classified the Upper Bronx River as a Class C water.  6 NYCRR § 935.6 (Table I).

118.    Under New York State's water quality standards and classifications, a waterbody that is designated Class C is meant to be suitable for fish, shellfish, and wildlife propagation and survival, its water quality is meant to be suitable for primary and secondary contact recreation, and its "best usage" is fishing.  6 NYCRR § 701.8.

119.    New York State water quality standards set numeric and narrative criteria for water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, metals, and others.  *See generally* 6 NYCRR Part 703.  A waterbody must meet these numeric and narrative criteria in order to support its designated uses.  *See generally* Division of Water Technical and Operational Guidance Series, *Ambient Water Quality Standards and Guidance Values and Groundwater Effluent Limitations*, N.Y. DEP'T ENVTL. CONSERVATION, (June 1998), http://www.dec.ny.gov/docs/water_pdf/togs111.pdf.

120.    In particular, in the Upper Bronx River, the state water quality standards provide that "the minimum daily average [DO concentration] shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/ L." *Id*.  Those standards apply to Class C waters that are *not* "trout spawning waters" or "trout waters."

121.     There are numeric water quality standards for dissolved oxygen ("DO") and other parameters in Class C waters including the Upper Bronx River.  6 NYCRR § 703.3.

122.     The Upper Bronx River fails to meet state water quality standards.  DEC has designated the Upper Bronx River as impaired pursuant to CWA Section 303(d), 33 U.S.C. § 1313(d), for Oxygen Demand.  *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*, Final 2018 Section 303(d) List, N.Y. DEP'T ENVTL. CONSERVATION, (June 2020), https://www.dec.ny.gov/docs/water_pdf/section303d2018.pdf at 7.  The suspected source of the impairing pollutant is "Urb/Storm Runoff."  *Id*.

123.     DEC's fact sheet for the Upper Bronx River reports, *inter alia*, that the waterbody segment's fishing and secondary contact recreation uses are impaired by low dissolved oxygen and fecal coliform.  DEC, "Bronx River, Upper, and tribs, (Segment ID 1702-0107)," Waterbody Segment Assessment Factsheet Based on the 2021 CALM, Revised: December 07, 2021, available at: https://extapps.dec.ny.gov/data/WQP/PWL/1702-0107.html

124.     Downstream from White Plains, the Upper Bronx River flows through lower Westchester County into the Bronx, where the river segments are referred to as "Bronx River, Middle, and tribs" (Segment ID 1702-0106) and "Bronx River, Lower" (Segment ID 1702-0006), the latter of which is also impaired due to low DO.  The Bronx River then empties into the East River between Hunts Point and Soundview, in the segment of that river referred to as "East River, Upper" (Segment ID 1702-0010), which is the portion from Hells Gate to the Whitestone Bridge.  All of those Bronx River and East River segments are in the Atlantic Ocean/Long Island Sound drainage basin.

### Defendants' General Permit Coverage

125.     The Facilities have been covered by the General Permit or prior versions of the

General Permit since Defendants first submitted an NOI to DEC in 2017.  Defendants subsequently submitted NOIs in 2018 and 2023, respectively, to be covered by the 2018 General Permit and the 2023 General Permit.

126.    The Fisher Facility's SPDES General Permit ID number is NYR00F877.  The Fulton Facility's SPDES General Permit ID number is NYR00F891.  In its 2017, 2018, and 2023 NOIs, Defendants certified that they had prepared SWPPPs that meet the standards of the General Permit for both Facilities.

127.    Under the General Permit, Defendants are authorized to discharge stormwater associated with industrial activity into waters of the United States *only* through the outfalls that Defendants have identified in their NOIs—*i.e.*, Outfall Nos. 001, 002, and 006 and the Fisher Facility and Outfall 001 at the Fulton Facility.

128.    Defendants have submitted ACRs and other forms to DEC, pursuant to the General Permit's reporting requirements, and have retained other forms with or as a part of their SWPPP.

### Defendants Discharge Excessively Polluted Stormwater

129.    Defendants have taken samples or arranged for samples to be taken of stormwater discharges from the Facilities.  The sample results were either reported to the DEC on written DMRs (in earlier years) or to the EPA and DEC jointly through EPA's electronic system for submission of DMRs online (in later years).  Pursuant to the General Permit, Defendants certified under penalty of law that, to the best of their knowledge and belief, each of those reports is true, accurate, and complete.

130.    In these stormwater sampling results, since 2018, Defendants have consistently reported high pollutant levels that exceed applicable benchmarks.  In particular, the Facilities

have discharged and continue to discharge stormwater with levels of Chemical Oxygen Demand ("COD") and Oil & Grease that exceed the applicable benchmarks.

131. More specifically, there have been at least 60 self-reported benchmark exceedances of Chemical Oxygen Demand and 6 self-reported benchmark exceedances of Oil & Grease at the Fisher Facility since 2018.

132. Stormwater discharges at the Fisher Facility exceeded the benchmark cutoff concentration for Chemical Oxygen Demand in the fourth quarter of 2018, three out of four quarters in 2019, three out of four quarters in 2020, all four quarters in 2021 and 2022, two out of four quarters in 2023, and both quarters that have been reported for 2024.

133. Defendants have thus exceeded the COD benchmark at the Fisher Facility in 19 out of the past 23 quarters, and it appears that Defendants failed to sample its discharges in some of four quarters in which it did not report exceedances.

134. In many quarters when Defendants did sample and report, there were COD exceedances at all three of the Fisher Facility's outfalls.  Many of these exceedances drastically exceeded the benchmark.  For example, the majority of the COD exceedances at the Fisher Facility are more than double the benchmark cutoff concentration and, at times, the facility's discharges contained between 10 and 20 times more COD than the benchmark.

135. At the Fulton Facility, there have been at least 15 self-reported benchmark exceedances of Chemical Oxygen Demand and 3 self-reported benchmark exceedances of Oil & Grease since 2019.

136. Stormwater discharges at the Fulton Facility exceeded the benchmark cutoff concentration for Chemical Oxygen Demand in the third quarter of 2019, two out of three quarters in 2020, two out of three quarters in 2021, all four quarters in 2022, three out of four

quarters in 2023, and the first quarter of 2024.

137.    Defendants have thus exceeded the COD benchmark at the Fulton Facility in 14 out of 20 quarters, and it appears that Defendants failed to sample in some of the 6 quarters it did not report an exceedance.  Exceedances at the Fulton Facility have ranged up to 9 times the benchmark cutoff concentration

138.    Further details related to these exceedances, including the year and monitoring period in which the samples were taken, the outfalls from which the discharges occurred, and the concentrations of COD and Oil & Grease that were measured and reported for each discharge are set forth in Table 1 on pages 11 to 13 of Plaintiffs' Notice Letter, which is Exhibit A to this complaint and incorporated herein by reference.  Additional details are contained in Defendants' monitoring records.

139.    As discussed above, the Upper Bronx River is impaired due to low dissolved oxygen, yet Defendants have been discharging industrial stormwater with elevated levels of Chemical Oxygen Demand from both Facilities into the Upper Bronx River for the vast majority of the past six years.  This demonstrates that Defendants do not have adequate measures at either of the Facilities to control pollutants in its stormwater

**Defendants' Violations of Water Quality Standards**

140.    Defendants' discharges from the Facilities cause or contribute to violations of New York State water quality standards, specifically the applicable water quality standards for dissolved oxygen in the Upper Bronx River, which provide that, for Class C non-trout waters including the Upper Bronx River, "the minimum daily average [DO concentration] shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/ L."  6 NYCRR § 703.3.

141.    The Upper Bronx River (i.e., "Bronx River, Upper, and tribs") is impaired due to the failure to attain those water quality standards.  Further, the low dissolved oxygen in the Upper Bronx River is impairing the designated uses of that waterbody, such as fishing.

142.    As set forth in Tables 1 and 2 in the Notice Letter, attached hereto as Exhibit A, Defendants' own stormwater sampling measured Chemical Oxygen Demand[2] concentrations above the benchmark concentration cutoff at least 75 times since 2018, with many of these measurements many multiples and, at times, an order of magnitude above the benchmark.

143.    The elevated levels of Chemical Oxygen Demand in the Facilities' stormwater discharges are strong evidence that Defendants are causing or contributing to the violations of the applicable water quality standards for dissolved oxygen established by DEC in the Upper Bronx River

**Defendants' Inadequate Stormwater Pollution Controls**

144.    Defendants do not have legally sufficient stormwater control measures and BMPs installed and maintained at the Facilities.  The structural and non-structural controls, practices, and measures at the Facilities have been since 2017, and currently are, inadequate to minimize pollution in industrial stormwater discharged to waters of the United States.

145.    For example, the Facilities lack sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent precipitation and stormwater flows from coming into contact with exposed areas of contaminants.  In the absence of such controls, stormwater falling on and flowing across the Facilities comes in contact with industrial

---

[2] Chemical Oxygen Demand is a measure of the amount of dissolved oxygen in water that will be consumed by chemical reactions (oxidation) between the water and the pollutants in Defendant's stormwater.  A high COD value indicates elevated quantities of oxygen-consuming pollutants.  Stormwater discharges with high levels of COD reduce the amount of dissolved oxygen in receiving waters, thereby contributing to hypoxic conditions.

materials, equipment, debris, and other pollutants and sources of pollutants, thereby polluting and contaminating that stormwater.

146.    The Facilities also lack stormwater pollution treatment technologies to treat stormwater once contaminated or prevent its discharge.

147.    The Facilities also lack sufficient housekeeping practices and other non-structural BMPs to minimize stormwater pollution.

148.    The Facilities' longstanding, continuing, and repeated failures to implement and maintain legally sufficient pollution controls are evidenced by, *inter alia*, benchmark monitoring results, visual monitoring results, and observations of the Facilities.

### Defendants' Failures to Take Corrective Actions

149.    Defendants have failed and continue to fail to take timely and sufficient corrective actions, as required by the General Permit, in response to benchmark exceedances, stormwater sample results showing a reasonable potential to cause or contribute to a violation of water quality standards, and observations of pollution in stormwater.

150.    To be sufficient, corrective actions would have to have been successful in minimizing pollution, including benchmark exceedances and visual indications of pollution. General Permit, Parts V, V.A.4.

151.    To be timely, corrective actions would have to comply with the corrective action deadlines set forth in General Permit, Part V.A.2 and described in Paragraphs 61-71, above, *i.e.*, the implementation must be completed before the next anticipated storm event, if practicable, but not more than 12 weeks after discovery (unless DEC's Regional Water Manager has granted a written extension, which did not occur here).

152.    To be properly documented, corrective actions must be reflected on corrective

action forms and result in appropriate revisions to the SWPPP.

153.    Defendants have failed and continue to fail to implement sufficient corrective actions as required by the General Permit.  These violations are evidenced by the Facilities' continued stormwater sample results showing exceedances of the benchmarks and showing a reasonable potential to cause or contribute to a violation of water quality standards, as well as Defendants' observations of pollution in quarterly visual observations.  The benchmark exceedances, in particular, have occurred in almost every year since Defendants first obtained General Permit coverage more than seven years ago.

154.    On at least one occasion Defendants reported to DEC that although their quarterly observations of stormwater discharges from the Fisher Facility revealed visual indicators of stormwater pollution and contamination, Defendants did not take any corrective actions as required by the General Permit.

155.    On other occasions, Defendants have mentioned potential corrective actions that have either not been implemented or have not been effective to address the excess pollution in its stormwater discharges.

156.    Defendants' Annual Certification Reports admit that the stormwater discharges at both Facilities are exceeding benchmarks for Chemical Oxygen Demand and/or Oil & Grease and discharging a Pollutant of Concern to a waterbody that is impaired by that pollution parameter (*i.e.*, the COD discharges into the DO-impaired Upper Bronx River).

157.    Year after year, those reports repeat the same or similar statements regarding measures Defendants have taken or plan to take to address that pollution—such as, "more rigorous housekeeping activities and parking lot sweeping," "increased housekeeping," "additional housekeeping activities to lower floating and suspended solids and improve clarity

and COD," "more diligent parking lot sweeping and cleaning of any specific staining in the parking lot.

158.    However, as revealed by the continuing benchmark exceedances, Defendants' "housekeeping" and "sweeping," if actually implemented, and any other potentially corrective actions, have not addressed the stormwater pollution and do not fulfill Defendants' obligation to take corrective action.

159.    Worse yet, one "corrective action" that Defendants stated they implemented at both Facilities—pressure washing (also referred to as power washing) the parking area—not only failed to correct the stormwater pollution problem, but itself constitutes an additional source of unlawful pollution and violates the Clean Water Act at the Facilities, as alleged below

**Defendants' Inadequate Stormwater Pollution Prevention Plans**

160.    Defendants have not prepared and implemented adequate SWPPPs for the Facilities.

161.    Defendants' SWPPPs for each Facility, in Section 6.1, contains a generic list of control measures which purportedly "have been evaluated and implemented where possible at this Facility," without identifying which, if any, of those control measures have actually been implemented.  This violates the General Permit's requirement in Part III.A.7 that the SWPPP must document and describe each BMP, its location, and how it is being implemented.  It also violates the requirement in that same part of the General Permit that the SWPPP must contain an explanation of why any BMPs were deemed not appropriate for a Facility.

162.    Where Defendants' SWPPPs identify specific control measures as being present at the Facilities, they fail to do so accurately and consistently.  For example, Section 6.2.4.1 of the SWPPP for the Fulton Facility states "The Facility is not equipped with an oil/water

separator (OWS)," while Section 6.4 (Stormwater Treatment BMPs) of that same SWPPP states "The Facility is equipped with water treatment BMPs in the form of an OWS and storm drain filter bags." Observation of the Fulton Facility also indicates that the Facility is not using the storm drain filter bags mentioned in the SWPPP.

163. The SWPPPs for the Facilities do not set forth adequate site-specific BMPs, such as adequate structural control measures and housekeeping measures, to be consistent with the BAT/BCT standard, and to meet the General Permit's requirement to minimize pollutant discharges.

164. Based on the numerous, repeated, extensive exceedances of benchmarks and reports of visual observation of pollution in stormwater, Notifiers allege that the SWPPPs for the Facilities do not comply with the General Permit and that Defendants do not implement the SWPPP correctly.

165. Defendants' SWPPPs do not include, and Defendants have not implemented, the required minimum and industry-specific control measures necessary to reduce pollutant levels in discharges to BAT and BCT levels. This is evidenced by the Facilities' discharges of stormwater with pollutants at levels that exceed applicable benchmark concentrations—including Chemical Oxygen Demand, which is a pollutant of concern for the impaired Upper Bronx River—and that cause or contribute to water quality standard violations.

166. To the extent that the SWPPPs contain certain components that do comply with General Permit requirements, Defendants do not implement those components of the SWPPPs correctly and consistently.

167. Based on the reporting of pressure washing as a purported "corrective action," whether or not detergent is used, the SWPPP does not include adequate documentation of this

non-stormwater discharge, as required by the General Permit

168.    Further, Defendants have failed to keep the SWPPP current by amending it whenever there have been changes in design, construction, operation, or maintenance at the Facilities that affect the potential to discharge pollutants, and whenever the SWPPP has been found to be ineffective in eliminating or significantly minimizing pollutants, thus requiring corrective actions.

### Defendants' Inadequate Inspection, Monitoring, Recordkeeping and Reporting

169.    Defendants have failed to comply with the General Permit's comprehensive inspection, monitoring, recordkeeping and reporting requirements.

170.    Defendants have failed to perform required visual examinations of their stormwater discharges at the Fisher Facility in 2019, 2021, and 2023, and at the Fulton Facility in the same years, 2019, 2021, and 2023.

171.    Defendants have failed to conduct benchmark sampling on multiple occasions, including at the Fisher Facility in, at least, the first quarter of 2018 and the third quarter of 2019, and at the Fulton Facility in, at least, the first quarter of 2018 and the first quarter of 2019.

172.    Because Defendants exceeded the benchmark cutoff concentration for Chemical Oxygen Demand in at least 33 quarters, Defendants have been required by 2023 Permit, Part VI.A.2.a(1) and 2018 Permit, Part VI.A.2.b to submit at least 33 Corrective Action/Non Compliance Event Forms.  But Defendants have never submitted that required form.

### Defendants' Unpermitted Discharges

173.    The General Permit provides coverage only for stormwater discharges and certain approved non-stormwater discharges, including "routine external building washdown and vehicle washing which does not use detergents or other compounds; [and] pavement washwaters where

spills or leaks of toxic or hazardous materials, other than minor and routine releases from motor vehicles, have not occurred (unless such material has been removed) and where detergents are not used," but only if the SWPPP details the authorized non-stormwater discharges by, inter alia, identifying the discharge and the location it is likely to occur and describes appropriate BMPs for each non-stormwater source.  2023 and 2018 Permit, Parts I.B.2, III.A.7.f; 6 NYCRR § 750-1.2(a)(29)(vi).

174.    On several of their Annual Certification Reports—specifically, the reports for 2021 and 2022—Defendants stated that they were pressure washing (power washing) the pavement at both Facilities as a purported "corrective action" to address stormwater pollution.

175.     Washing pavement that is suspected to contain pollutants merely accelerates the discharge of those pollutants to waters of the United States, unless the pavement washing wastewater is collected in a proper collection system and not discharged through a stormwater system or other conveyance.

176.    Defendants' discharge of pavement washing wastewater is also unpermitted and unlawful unless no detergents are used and the SWPPP specifically details the pavement washing as an authorized non-stormwater discharge and describes the BMPs used to minimize pollution, such as capturing or treating the wastewater.

177.    Instead of correcting the pollution problem, Defendants' pavement washing has exacerbated it and created an additional category of violations.

178.    If vehicles or equipment are washed using detergents or other compounds outside at either Facility without capturing the wastewater, or if any wastewater is not fully contained within the bus wash bay at the Fisher Facility, such wastewater discharges are not and cannot be covered under the General Permit.

**DEC Inspection**

179.    After receiving a copy of Plaintiffs' Notice Letter, DEC inspected the Facilities on November 18, 2024, and November 26, 2024, and issued a Notice of Violation to each Facility on December 4, 2024, identifying various violations of the General Permit.

**Ongoing Pollution and Failures to Comply**

180.    As discussed above, information available to Plaintiffs demonstrates that, for the past six years and presently, Defendants have violated and continue to violate the requirements set forth in the General Permit and the Clean Water Act for discharges of stormwater associated with industrial activity from the Facilities and have discharged pollutants without permit authorization.

181.    Further detailed facts, including additional detail on specific dates of incidents and conditions that constitute violations of the General Permit and the Clean Water Act, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference and in Defendants' SWPPPs and inspection and monitoring reports that they maintain pursuant to the General Permit.

182.    Defendants' numerous longstanding violations of the Clean Water Act at the Facilities are ongoing and continuous, recurring, and result from the same underlying and unresolved causes.

**VI.**

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Failure to Implement Adequate Pollution Control Measures and
Best Management Practices Meeting the Federal BAT and BCT Standards
(33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

183.    Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth

herein.

184.     The General Permit requires Defendants to implement control measures to meet the non-numeric, numeric and water quality based effluent limitations contained in Parts II and VII of the General Permit that are sufficient to minimize the discharge of pollutants in stormwater, and thereby satisfy the BAT/BCT Standard.

185.     Defendants have violated and continue to violate Parts II and VII of the General Permit by failing to implement sufficient structural and non-structural control measures and BMPs to minimize the discharge of pollutants in their industrial stormwater.

186.     The control measures and BMPs that Defendants have implemented do not meet the BAT/BCT Standard, as required by the General Permit and the Clean Water Act.

187.     Defendants' failures to implement sufficient control measures and BMPs that meet the BAT/BCT Standard is evidenced by, among other things, repeated benchmark exceedances (including discharges of elevated levels of Chemical Oxygen Demand and Oil & Grease), visual observations of pollution in stormwater, and observations of the Facilities.

188.     Defendants have failed to develop and implement pollution controls equivalent to the BAT/BCT Standard at the Facilities every day since at least October 16, 2019, or earlier. Each day upon which Defendants operate either Facility without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## SECOND CAUSE OF ACTION

### Causing or Contributing to Violations of Water Quality Standards
### (33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))

189.     Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth

herein.

190.    The General Permit prohibits Defendants from causing or contributing to violations of water quality standards.  General Permit, Part II.C.1.a.

191.    Since at least 2018, Defendants have been discharging polluted stormwater from the Facilities with levels of Chemical Oxygen Demand that exceed the General Permit's benchmark cutoff concentrations and cause or contribute to violations of the water quality standards for dissolved oxygen in the Upper Bronx River.

192.    Every day since at least October 16, 2019, that Defendants have discharged polluted stormwater from the Facilities that causes or contributes to a violation of water quality standards is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## THIRD CAUSE OF ACTION

### Failure to Take Corrective Actions
### (33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))

193.    Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth herein.

194.    Parts V and II.C.1.b of the General Permit require Defendants to implement corrective actions when, *inter alia*: benchmarks are exceeded; visible pollution is observed; discharges may cause or contribute to water quality standard violations; or site inspections indicate the presence of pollution.

195.    Defendants are failing to take timely and sufficient corrective actions in response to their benchmark monitoring sample results demonstrating exceedances for Chemical Oxygen Demand, as required by Parts V.A.1–3 of the General Permit.

196.    Defendants are failing to take timely and sufficient corrective actions in response

to quarterly visual monitoring indicating the presence of pollution in their stormwater discharges, as required by Parts V.A.1–3 of the General Permit.

197.    Defendants are failing to take timely and sufficient corrective actions in response to evidence, in the form of benchmark monitoring sample results indicating that their stormwater discharges are causing, have the reasonable potential to cause, or are contributing to a violation of water quality standards, as required by Parts II.C.1.b and V of the General Permit.

198.    Corrective actions that Defendants have taken, or attempted to take, have been untimely, improperly or inconsistently implemented, discontinued, and/or ineffective.

199.    Defendants are failing to continue efforts to implement additional BMPs in response to the failures of any prior corrective actions to achieve satisfactory quarterly visual monitoring and benchmark monitoring results, as required Part V.A.4 of the General Permit.

200.    Defendants have failed to comply with the corrective action requirements at the Facilities every day since at least October 16, 2019, or earlier.  Each day upon which Defendants fail to implement necessary corrective actions is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## FOURTH CAUSE OF ACTION

**Failure to Develop and Implement an
Adequate Storm Water Pollution Prevention Plan
(33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

201.    Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth herein.

202.    Part III of the General Permit requires Defendants to prepare and implement a SWPPP for each Facility that documents the practices and procedures to ensure compliance with the conditions of the General Permit, including the selection, design, installation and

maintenance of control measures selected to meet effluent limitations in Parts II and VII of the General Permit.

203.    Defendants have violated and are in violation of Part III of the General Permit by failing to prepare and implement a legally sufficient SWPPP for the Facilities.

204.    Defendants' SWPPPs do not set forth stormwater control measures that meet the BAT/BCT Standard.

205.    To the extent that certain components of Defendants' SWPPPs are sufficient, they have not been implemented at all, or have not been implemented in a timely, proper, sufficient, consistent manner and/or have otherwise failed to ensure compliance with the conditions of the General Permit.

206.    Among other things, Defendants' SWPPPs fail to contain a complete, accurate, and sufficient identification and description of stormwater controls, as required by Part III.A.7 of the General Permit.

207.    Defendants are failing to keep their SWPPP current, modify their SWPPP, and complete additional monitoring and analysis in response to changes in design, construction, operation, or maintenance at the Facilities and inspections and monitoring revealing that the chosen BMPs are ineffective in eliminating or significantly minimizing pollutants or are otherwise not achieving the General Permit's goals or requirement, as required by Part III.E of the General Permit.

208.    Defendants have failed to comply with the General Permit's SWPPP requirements every day since at least October 16, 2019, or earlier.  Each day upon which Defendants fail to have a legally sufficient SWPPP is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing

and continuous.

## FIFTH CAUSE OF ACTION

### Failure to Conduct Routine Site Inspections and Comply with Monitoring, Recordkeeping, and Reporting Requirements (33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))

209.    Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth herein.

210.    The General Permit imposes extensive inspection, monitoring, recordkeeping, and reporting requirements designed to ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs.  These requirements are set forth in Parts IV and VI of the General Permit and summarized in Paragraphs 50–57 and 83–86 above and in pages 19 to 22 of Plaintiff's Notice Letter, Exhibit A to this complaint, which is incorporated by reference.

211.    Defendants have violated and are in violation of Parts IV and VI of the General Permit by failing to comply with inspection, monitoring, recordkeeping, and/or reporting requirements for the Facilities.

212.    Defendants failed to perform required visual examinations of their stormwater discharges at the Fisher Facility in 2019, 2021, and 2023, and at the Fulton Facility in the same years, 2019, 2021, and 2023.

213.    Defendants failed to conduct benchmark sampling on multiple occasions, including at the Fisher Facility in, at least, the first quarter of 2018 and the third quarter of 2019, and at the Fulton Facility in, at least, the first quarter of 2018 and the first quarter of 2019.

214.     Defendants failed to submit at least 33 Corrective Action/Non Compliance Event Forms, one for each time Defendants exceeded the benchmark cutoff concentration for Chemical Oxygen Demand.

215.    Each and every day on which Defendant fails to comply with any of the General

Permit's inspection, monitoring, recordkeeping, and reporting requirements for each Facility is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

<u>**SIXTH CAUSE OF ACTION**</u>

**Unpermitted Discharges of Pollutants**
**(33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

216. Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth herein.

217. CWA Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), provides that the discharge into waters of the United States of any pollutant by any person is unlawful, unless authorized by a NPDES permit issued under Section 402 of the Act, 33 U.S.C. § 1342, or another appropriate CWA permit.

218. The General Permit authorizes Defendants to discharge stormwater only through the three outfalls identified in their NOI and SWPPPs.  General Permit, Part I.D.3 ("Stormwater discharges from industrial activities or outfalls not included in previously submitted NOIs are not authorized until a complete NOI is received."); *see also* 6 NYCRR § 750-1.2(a)(29) (defining "Discharges authorized by a SPDES permit" to mean "discharges of . . . stormwater from sources listed in the permit . . . that are through outfalls listed in the permit . . .").

219. Defendants' discharges of pavement washing wastewater are unpermitted and violate the Clean Water Act because, *inter alia*, the wastewater is not captured and treated and the SWPPP does not specifically detail pavement washing as an authorized non-stormwater discharge and describe BMPs used to minimize pollution from that activity.

220. Any vehicle wash wastewater using detergents or other compounds at either Facility that is discharged from the sites cannot be covered under the General Permit, and also

violates the Clean Water Act.

221.    Defendants have violated and are violating CWA Section 301(a) by discharging wastewater into the Upper Bronx River, which is a water of the United States, without permit authorization, during and as a result of pavement washing and/or vehicle washing.

222.    Each and every day on which Defendants discharge a pollutant from the Facilities without authorization under the General Permit or another NPDES or CWA permit is a separate and distinct violation of CWA Section 301(a), 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## VII.

## PRAYER FOR RELIEF

223.    Wherefore, Plaintiffs respectfully request that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a), 28 U.S.C. §§ 2201(a) and 2202, and the Court's equitable, inherent, and other authority:

a.    Declare Defendants to have violated and to be in violation of the Clean Water Act and the General Permit as alleged herein;

b.    Order Defendants to immediately comply fully with all applicable requirements of the General Permit and the CWA;

c.    Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit and the CWA;

d.    Enjoin Defendants from discharging pollutants from the Facilities except as authorized by and in compliance with the General Permit and the CWA;

e.    Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT and BCT;

f.  Order Defendants to immediately implement corrective actions as required by the General Permit;

g.  Order Defendants to amend and implement their SWPPP to comply with the General Permit;

h.  Order Defendants to comply with the General Permit's inspection, monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

i.  Order Defendants to provide Plaintiffs with reports documenting the quality of their stormwater discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

j.  Order Defendants to take appropriate actions to restore the quality of waters adversely affected by their unlawful activities;

k.  Order Defendants to pay civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

l.  Order Defendants to pay the costs of litigation, including Plaintiffs' reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

m.  Award any such other and further relief as this Court may deem appropriate.

Dated this 16th day of December, 2024
New York, New York

Respectfully submitted,

By: _____

Reed W. Super
Andie Altchiler

SUPER LAW GROUP, LLC
222 Broadway, 22nd Floor
New York, NY 10038
212-242-2355, Ext. 1
reed@superlawgroup.com

*Attorneys for Plaintiffs Riverkeeper,*
*Inc. and Save the Sound, Inc.*