# EXHIBIT A

# SUPER LAW GROUP, LLC

October 16, 2024

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

National Express LLC
2601 Navistar Drive
Lisle, IL 60532

White Plains Bus Co., Inc.
2601 Navistar Drive
Lisle, IL 60532

National Express LLC
441 Pineville Lane
Webster, NY 14580

White Plains Bus Co., Inc.
111 Eighth Avenue, 13th Floor
New York, NY, 10011

White Plains Bus Co., Inc.
14 Fisher Lane
White Plains, NY 10603

CT Corporation System
  Registered agent for
  White Plains Bus Co., Inc.
28 Liberty Street
New York, NY 10005

White Plains Bus Co., Inc.
91 Fulton Street
White Plains, NY 10606

Re:    **Notice of Violation and Intent to File Suit under the Clean Water Act;**
       **and Request for Stormwater Pollution Prevention Plan**

Dear National Express LLC and White Plains Bus Co., Inc.:

We are writing on behalf Riverkeeper, Inc. and Save the Sound, Inc. (hereinafter, "Notifiers") in regard to violations of the Federal Water Pollution Control Act ("Clean Water Act" or the "CWA")[1] occurring at your vehicle maintenance facilities in White Plains, New York, located at 14 Fisher Lane (the "Fisher Facility") and 91 Fulton Street (the "Fulton Facility") (collectively, the "Facilities").

This letter is being sent to National Express LLC and White Plains Bus Co., Inc. (collectively, "NELLC") as the responsible owners and/or operators of the Facilities.  This letter addresses NELLC's Clean Water Act permit violations and unlawful discharge of pollutants from the Facilities into waters of the United States as described below.  The Facilities are and have been discharging stormwater pursuant to—and are required to comply with—the *New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-23-001 ("2023 Permit") and prior versions of that permit, including the *New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004 ("2018 Permit").  The 2018 Permit went into effect on March 1, 2018, and expired on February 28, 2023.  Since March 1, 2023,

---

[1] 33 U.S.C. §§ 1251–1389.  We refer to statutory provisions by their section in the Clean Water Act and provide the parallel citation to the United States Code only on first reference.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 2 of 38

NELLC has been required to comply with the 2023 Permit.[2]  We refer to the 2023 Permit and the 2018 Permit in this letter collectively as the "General Permit."  In addition to violations of the General Permit, this notice of violation and intent to file suit ("Notice") addresses NELLC's unpermitted and unlawful discharge of wastewater from the Facilities to waters of the United States.  This letter also requests copies of NELLC's Stormwater Pollution Prevention Plans (SWPPPs) for the Facilities.

The Facilities are violating the substantive and procedural requirements of the General Permit and the CWA.  To address those ongoing violations, Notifiers intend to file suit in federal court, as organizations and on behalf of their adversely affected members, seeking appropriate equitable relief, civil penalties, and other relief no earlier than 60 days from the postmark date of this letter,[3] pursuant to Section 505(a) of the Clean Water Act.[4]

## I.

## BACKGROUND

To protect the waters of the United States, the Clean Water Act prohibits the discharge of pollutants into the waters of the United States except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit.[5]  NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the Clean Water Act.[6]

The New York State Department of Environmental Conservation ("DEC") has been delegated the authority to issue NPDES permits in New York State.  In New York, state-issued NPDES permits are referred to as State Pollutant Discharge Elimination System ("SPDES") permits.  DEC has elected to issue a statewide SPDES general permit for industrial stormwater discharges in New York—the General Permit.  The current version of the General Permit came into effect in March 2023.[7]

With every significant rainfall event, hundreds of millions of gallons of polluted rainwater pour into waterbodies in our region, including millions of gallons of polluted

---

[2] 2023 Permit, Part I.F.2 (providing coverage retroactive to expiration of 2018 permit).

[3] *See* 40 C.F.R. § 135.2(c) (notice of intent to sue is deemed to have been served on the postmark date).

[4] 33 U.S.C. § 1365(a).

[5] CWA §§ 301(a), 402(a); 33 U.S.C. §§ 1311(a), 1342(a).

[6] CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

[7] The 2023 Permit is available at *https://extapps.dec.ny.gov/docs/water_pdf/gp023001final03082023.pdf*.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 3 of 38

stormwater originating from industrial operations such as the Facilities.  Stormwater pollution poses a health risk to humans, harms aquatic life, closes beaches, contaminates rivers and lakes, and impairs the environment.  DEC has assessed 62% of New York State's 87,526 miles of rivers and streams, and has designated 9% of those miles, as well as 62% of assessed estuary waters, as impaired by pollutants.[8]  For the vast majority of waterbodies listed as impaired, stormwater runoff is a major source of the pollutants causing the impairment.[9]  Contaminated stormwater discharges can and must be controlled in order to improve and restore the quality and health of these waterbodies.

### A.      Riverkeeper, Inc. and Save the Sound, Inc.

Riverkeeper is a not-for-profit environmental organization existing under the laws of the state of New York, headquartered in Ossining, New York.  As New York's Clean Water Advocate, Riverkeeper's mission includes safeguarding the environmental, recreational, and commercial integrity of the Hudson River and other waters in our region, including the watersheds that provide New York City with its drinking water.  Riverkeeper achieves its mission through public education, advocacy for sound public policies, and participation in legal and administrative forums.  Riverkeeper has more than 3,800 members, many of whom reside near, use, and enjoy the Bronx River and the East River.

Save the Sound, Inc. is a not-for-profit environmental organization incorporated under the laws of the State of Connecticut, with a principal place of business in New Haven, Connecticut, and a New York office located in Larchmont, New York.  Save the Sound's primary purpose is to conserve and enhance the biological integrity of Connecticut's and New York's air, land, and water resources, including Long Island Sound, its tributaries, and watershed.  Save the Sound uses legal and scientific expertise, advocacy, and education in furtherance of its purpose to achieve results that benefit the environment for current and future generations.  Save the Sound represents approximately 4,200 member households, many of whom use and enjoy Long Island Sound and its tributary rivers and streams, including the Bronx River and East River, for swimming, boating, fishing, birding and wildlife viewing, photography, spiritual reflection, nature, scientific study, and other activities.

### B.      NELLC Facilities in White Plains

NELLC operates two vehicle and equipment storage and maintenance facilities in White Plains, New York—the Fisher Facility and the Fulton Facility—where industrial activities, including fueling and vehicle and equipment maintenance and cleaning, occur.  NELLC's industrial operations, vehicles, equipment, and materials are exposed to stormwater flows at the Facilities.

---

[8] *See 2018 Section 305(b) Water Quality Report*, N.Y. DEP'T ENVTL. CONSERVATION, 6 (2018), https://www.dec.ny.gov/docs/water_pdf/section305b2018.pdf.

[9] *See generally id.* (identifying urban stormwater runoff as a top ten source of water quality impairment).

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 4 of 38

Notifiers believe that NELLC has operated the Facilities since at least February 3, 2017, the date on which NELLC first signed and certified Notices of Intent ("NOIs") to be covered under the General Permit at the Facilities. On those NOIs, as well as the NOIs it submitted to DEC in 2018 and 2023, NELLC self-identified the Facilities' primary Standard Industrial Classification (SIC) code as 4151 (School Buses) in the 4111–4173 (Local and Highway Passenger Transportation) range of SIC codes. (A "primary" SIC code is the four-digit SIC code that best describes the primary industrial activities occurring at a facility). Under the General Permit, facilities with a primary SIC code of 4151 are assigned to the Land Transportation and/or Warehousing sector, also referred to as Sector P in the General Permit.[10]

NELLC discharges stormwater associated with industrial activity from the Facilities through multiple outfalls to the Bronx River. NELLC certified in 2018 and 2023 that there are three outfalls at the Fisher Facility—Outfall Nos. 001, 002, and 006—and only one outfall at the Fulton Facility—Outfall No. 001. Previously, in 2017, NELLC had identified only two outfalls at the Fisher Facility.

The Fisher Facility's SPDES General Permit ID number is NYR00F877. The Fulton Facility's SPDES General Permit ID number is NYR00F891. The NOIs and Annual Certification Reports ("ACRs") for the Facilities have most often identified the Owner/Operator as National Express LLC (NYS DOS ID 5301918), 2601 Navistar Drive, Lisle, IL 60532. Those forms have been certified by employees of National Express LLC, using their National Express LLC contact information. The forms provide several alternative facility names, including "White Plains Bus Co., Inc." for both Facilities, as well as "White Plains Fisher," "7037 CSC White Plains NY Transit," and "4037 CSC White Plains NY (Fulton)." On at least one form for the Fisher Facility and another for the Fulton Facility, the Owner/Operator of the Fisher Facility is listed as White Plains Bus Co., Inc. (NYS DOS ID 27263).

In its 2017, 2018, and 2023 NOIs, NELLC certified that it has prepared Stormwater Pollution Prevention Plans ("SWPPPs") that meet the standards of the General Permit for both Facilities.

### C.    Waters Receiving the Facilities' Discharges

Industrial activity at the Facilities takes place outdoors, where pollutants are exposed to stormwater that discharges into the Bronx River, specifically into the segment of the Bronx River identified by DEC as "Bronx River, Upper, and tribs" (Segment ID 1702-0107) (referred to herein as the "Upper Bronx River"). That segment includes the Bronx River and its tributaries

---

[10] *See* 2023 Permit, p. 176 (Appendix B – Sectors of Industrial Activity Covered by the Permit), pp. 121–124 (Sector P – Land Transportation and/or Warehousing). In 2023, NELLC identified SIC code 4131 (Intercity and Rural Bus Transportation) as a secondary applicable SIC code, in relation to one outfall at the Fisher Facility. Facilities in SIC code 4131 are also in Sector P and subject to the same requirements as those in SIC code 4151.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 5 of 38

above the Bronx-Westchester county line.[11]  DEC has classified the Upper Bronx River as a Class C water.[12]  Under New York State's water quality standards and classifications, a waterbody that is designated Class C is meant to be suitable for fish, shellfish, and wildlife propagation and survival, its water quality is meant to be suitable for primary and secondary contact recreation, and its "best usage" is fishing.[13]

New York State water quality standards set numeric and narrative criteria for water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, metals, and others.[14]  A waterbody must meet these numeric and narrative criteria in order to support its designated uses.[15]  There are numeric water quality standards for dissolved oxygen ("DO") and other parameters in Class C waters including the Upper Bronx River.[16]  In particular, in the Upper Bronx River, the state water quality standards provide that "the minimum daily average [DO concentration] shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/ L."[17]

The Upper Bronx River fails to meet state water quality standards.  DEC has designated the Upper Bronx River as impaired pursuant to CWA Section 303(d)[18] for Oxygen Demand.[19]  DEC's fact sheet for the Upper Bronx River reports, *inter alia*, that the waterbody segment's fishing and secondary contact recreation uses are impaired by low dissolved oxygen and fecal coliform.[20]

---

[11] *See* DEC, Bronx River, Upper, and tribs, (Segment ID 1702-0107), Waterbody Segment Assessment Factsheet Based on the 2021 CALM, Revised: December 07, 2021, available at: https://extapps.dec.ny.gov/data/WQP/PWL/1702-0107.html

[12] 6 NYCRR § 935.6 (Table I).

[13] 6 NYCRR § 701.8.

[14] *See generally* 6 NYCRR Part 703.

[15] *See generally* Division of Water Technical and Operational Guidance Series, *Ambient Water Quality Standards and Guidance Values and Groundwater Effluent Limitations*, N.Y. DEP'T ENVTL. CONSERVATION, (June 1998), http://www.dec.ny.gov/docs/water_pdf/togs111.pdf.

[16] 6 NYCRR § 703.3.

[17] *Id*.  Those standards apply to Class C waters that are *not* "trout spawning waters" or "trout waters."

[18] 33 U.S.C. § 1313(d).

[19] *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*, Final 2018 Section 303(d) List, N.Y. DEP'T ENVTL. CONSERVATION, (June 2020), https://www.dec.ny.gov/docs/water_pdf/section303d2018.pdf at 7.  The suspected source of the impairing pollutant is "Urb/Storm Runoff."  *Id*.

[20] DEC, "Bronx River, Upper, and tribs, (Segment ID 1702-0107)," Waterbody Segment Assessment

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 6 of 38

Downstream from White Plains, the Upper Bronx River flows through lower Westchester County into the Bronx, where the river segments are referred to as "Bronx River, Middle, and tribs" (Segment ID 1702-0106) and "Bronx River, Lower" (Segment ID 1702-0006), the latter of which is also impaired due to low DO. The Bronx River then empties into the East River between Hunts Point and Soundview, in the segment of that river referred to as "East River, Upper" (Segment ID 1702-0010), which is the portion from Hells Gate to the Whitestone Bridge. All of those Bronx River and East River segments are in the Atlantic Ocean/Long Island Sound drainage basin.

**II.**

**STANDARDS AND LIMITATIONS ALLEGED TO HAVE BEEN VIOLATED AND ACTIVITIES ALLEGED TO BE VIOLATIONS**

The Clean Water Act provides that "the discharge of any pollutant by any person shall be unlawful" unless it is in compliance with the terms of a NPDES permit.[21] The Facilities discharge stormwater associated with industrial activity, which is itself a pollutant. That stormwater also contains various pollutants associated with vehicle maintenance facilities, including the pollutants specifically discussed below.

NELLC's coverage under the General Permit authorizes the Facilities' discharges of stormwater associated with industrial activity and associated pollutants conditioned on NELLC's compliance with the terms of the General Permit.[22] Each permit term constitutes an "effluent standard or limitation" within the meaning of CWA Section 505(f).[23] NELLC must comply at all times with the generally applicable requirements of the General Permit and also with the specific requirements for Sector P.[24]

---

Factsheet Based on the 2021 CALM, Revised: December 07, 2021, available at: https://extapps.dec.ny.gov/data/WQP/PWL/1702-0107.html

[21] CWA § 301(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities).

[22] 2023 Permit, Part I.D. *See also* 6 NYCRR § 750-2.1(e) ("Any [SPDES] permit noncompliance constitutes a violation of the Environmental Conservation Law and the Clean Water Act and is grounds for: enforcement action; for permit suspension, revocation or modification; and for denial of a permit renewal application.").

[23] 33 U.S.C. § 1365(f).

[24] 2023 Permit, Part VII, Sector P; 2018 Permit, Part VII, Sector P. *See also* 6 NYCRR § 750-2.1(e) ("Any [SPDES] permit noncompliance constitutes a violation of the Environmental Conservation Law and the Clean Water Act and is grounds for: enforcement action; for permit suspension, revocation or modification; and for denial of a permit renewal application.").

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 7 of 38

Information available to Notifiers indicates that the Facilities' stormwater discharges and stormwater management practices have violated many General Permit terms and conditions, thereby violating CWA effluent limitations and CWA Sections 301(a) and 402(p).  NELLC is also discharging wastewater without a permit, in violation of the CWA.  In sum, these violations include:

- NELLC has not developed, implemented, and/or maintained sufficient stormwater management practices, structural controls, or treatment ("best management practices" or "BMPs"[25]) at the Facility to minimize exposure of pollutants to stormwater, retain stormwater on site, or prevent contaminants from being discharged in stormwater.

- NELLC is causing or contributing to violations of New York State water quality standards for dissolved oxygen in Class C waters.

- NELLC is not taking required corrective actions in response to BMP failures, benchmark exceedances, violations of water quality standards, and its own observations of pollution in stormwater discharges.

- NELLC has not developed and/or implemented a SWPPP for the Facility that meets the requirements of the General Permit.

- NELLC is not complying with all of the inspection, monitoring, recordkeeping, and reporting requirements of the General Permit.

- NELLC is discharging polluted wastewater without a NPDES/SPDES permit in violation of the Clean Water Act.

All of these violations are further explained below.

### A. NELLC is Violating the CWA and the General Permit by Failing to Implement Adequate Pollution Control Measures.

The Clean Water Act requires NPDES/SPDES permittees to use pollution control measures that reflect—and prohibits the discharge of pollutants above—the level that is commensurate with application of the best available technology economically achievable ("BAT"), which applies to toxic and non-conventional pollutants, and best conventional

---

[25] BMPs include "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the State.  BMPs also include treatment requirements (if determined necessary by the owner or operator), operating procedures, and practices to control plant site runoff, spillage and leaks, sludge or waste disposal, or drainage from raw material storage."  2023 Permit and 2018 Permit, Appendix A (definitions).

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 8 of 38

pollutant control technology ("BCT") for conventional pollutants.[26]

The General Permit implements these federal standards by imposing "effluent limitations"[27] that require NELLC to adopt both generally applicable and sector-specific control measures in order to "minimize the discharge of pollutants" from the Facility.[28]  In particular, the General Permit defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."[29]

The General Permit sets forth non-numeric technology-based effluent limitations, grouped into twelve categories, with which NELLC must comply, in order to minimize pollutant discharges, which are briefly summarized as follows:[30]

1.  "Minimize Exposure" – This includes measures operators must take to prevent industrial activities and materials (manufacturing, processing, and material storage) from exposure to rain, snow, snowmelt, and runoff.

2.  "Good Housekeeping" – This includes measures operators must take to "[k]eep clean all exposed areas that are potential sources of pollutants . . . in order to minimize pollutant discharges."

3.  "Maintenance" – "[T]o minimize pollutant discharges and achieve the effluent limitations in the [General Permit], all industrial equipment and systems and control measures must be maintained in effective operating condition."

---

[26] *See* CWA §§ 304(b)(2), (4); 33 U.S.C. § 1314(b)(2), (4).  Conventional pollutants are biochemical oxygen demand (BOD), total suspended solids (TSS), pH, and fecal coliform, and oil and grease (O&G). 40 C.F.R. § 401.16.  Toxic pollutants include lead and zinc.  40 C.F.R. § 401.15.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.16.

[27] For purposes of a Clean Water Act citizen suit, any requirement of a permit is an "effluent limitation." *See* 33 U.S.C. § 1365(f) ("For purposes of this section, the term "effluent standard or limitation under this chapter" means . . . (7) a permit or condition of a permit[.]").

[28] 2023 Permit, Part II at p.7; 2018 Permit, Part II at p.8 (requiring permittees to minimize the discharge of pollutants).  *See generally* 2023 Permit and 2018 Permit, Part II (effluent limitations for all operators); Part VII (sector-specific effluent limitations).

[29] 2023 Permit, Appendix A (definitions); *see also* 2018 Permit, Appendix A (definitions).  "Control measure" is itself a defined term meaning "any BMP stormwater control or other method (including non-numeric effluent limitations) used to prevent or reduce the discharge of pollutants to Surface Waters of the State."  2023 Permit, Appendix A; (definitions) *see also* 2018 Permit Appendix A (definitions).

[30] 2023 Permit, Parts II.A.1-A.1.; 2018 Permit, Parts II.A.1-A.12.  Please see those sections of the General Permit for the full text of the requirements.  *See also* 2023 Permit, Part II.D. ("Best Management Practices Selection and Design Considerations"); 2018 Permit, Part II.D (same).

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 9 of 38

4.      "Spill Prevention and Response Procedures" – Operators must "[m]inimize the potential for leaks, spills and other releases that may be exposed to stormwater and develop plans for effective response to such spills if or when they occur in order to minimize pollutant discharges."

5.      "Erosion and Sediment Controls" – "Exposed areas must be stabilized and stormwater runoff controlled using structural and/or non-structural control measures to minimize onsite erosion and sedimentation."

6.      "Management of Runoff" – Operators must divert, infiltrate, reuse, contain, or otherwise reduce stormwater runoff, to minimize pollutants in the discharges."

7.      "Salt Storage Piles or Piles Containing Salt" – Operators must "enclose or cover storage piles of salt, or piles containing salt" and "[i]mplement appropriate measures . . . to minimize exposure resulting from adding to or removing materials from the site."

8.      "Employee Training" – Operators must thoroughly train, annually, "[a]ll employees who work in areas where industrial materials or activities are exposed to stormwater," or who are responsible for implementing activities necessary to meet the requirements of the General Permit.

9.      "Non-Stormwater Discharges" – These must be eliminated unless authorized by a SPDES permit.

10.     "Waste, Garbage and Floatable Debris" – Operators must "[e]nsure that waste, garbage, and floatable debris are not discharged to surface waters of the state by keeping exposed areas free of such materials or by intercepting them before they are discharged."

11.     "Dust Generation and Vehicle Tracking of Industrial Materials" – Operators must "[m]inimize generation of dust and off-site tracking of raw, final, or waste materials in order to minimize the pollutant discharges."

12.     "Secondary Containment" – Operators must "[e]nsure that compliance is maintained with all applicable regulations including, but not limited to, those involving releases, registration, handling and storage of petroleum, chemical bulk and hazardous waste storage facilities."

The General Permit sets forth additional non-numeric effluent limitations based on a

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 10 of 38

particular facility's sector.[31]  For facilities in Sector P, the General Permit requires "Benchmark Monitoring," which "means sampling and analysis of stormwater discharges" for certain sector-specific pollutants (a/k/a "parameters").[32]  The General Permit establishes the following "Benchmark Monitoring Cut-off Concentrations" for Sector P facilities:

> Oil & Grease – 15 mg/L
> Chemical Oxygen Demand (COD) – 120 mg/L
> Benzene – 50 ug/L
> Ethylbenzene – 50 ug/L
> Toluene – 50 ug/L
> Xylene – 50 ug/L[33]

Benchmark monitoring "is intended to provide a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." [34]  All exceedances of a benchmark require an owner or operator of a facility "to evaluate potential sources of stormwater contaminants at the facility and perform corrective actions."[35]  The benchmarks thus serve as guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures and successfully minimized the discharge of pollutants as required by the General Permit.

As described below, stormwater sampling from the Facilities shows numerous significant exceedances of the benchmarks since 2017, when NELLC first obtained coverage under the General Permit.  In particular, the Facilities have discharged and continue to discharge stormwater with unacceptable levels of Chemical Oxygen Demand (COD) and Oil & Grease that exceed the applicable benchmarks.  These exceedances, as well as reports submitted to DEC pursuant to the General Permit, including those that document visual observations of pollution in the Facilities' stormwater, are strong evidence of NELLC's failure to implement adequate control measures that meet the required BAT/BCT standards, minimize pollution, and meet the other effluent limitations in the General Permit.  Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation."[36]

---

[31] 2023 Permit, Part VII, Sector P; 2018 Permit, Part VII, Sector P.

[32] 2023 Permit, Appendix A; 2018 Permit, Appendix A.

[33] 2023 Permit, Table VII-P-1; 2018 Permit, Table VIII-P-1.

[34] 2023 Permit, Part IV.F.1.a; 2018 Permit, Part IV.F.1.a.

[35] 2023 Permit, Part IV.F.3.c; 2018 Permit, Part IV.F.3.c(1)

[36] *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), *vacated on other grounds*, 485 U.S. 931 (1988); *see also Pub. Interest Research Grp., Inc. v. GAF Corp.*, 770 F. Supp. 943, 953–54 (D.N.J. 1991) (citing *Garner v. United States*, 424 U.S. 648, 665 (1976); *United States v. Ward*, 448 U.S. 242, 254 (1980) ("It is well established that records required to be kept by law, such as DMRs, may be deemed to

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 11 of 38


The information below in Tables 1 and 2 reflect data gathered from NELLC's discharge monitoring reports ("DMRs")[37] submitted to DEC and EPA. These discharges of pollutants are evidence of ongoing violations of the non-numeric effluent limitations set forth in the General Permit. Notifiers allege that discharges from the Facilities have exceeded and continue to exceed the benchmarks for Chemical Oxygen Demand and Oil & Grease not only on the days when stormwater samples were collected by NELLC, but also on other days between and after those sampling days because the industrial activities and stormwater control measures at the Facilities are similar on sampling days and non-sampling days.

**Table 1:  Summary of the Fisher Facility's Self-Reported Benchmark Exceedances (2018 Quarter 4 – 2024 Quarter 2)[38]**

| Pollutant | Year/Monitoring Period | Benchmark | Sample Concentration | Outfall |
|---|---|---|---|---|
| COD | 2024 Q2 | 120 mg/L | 580 mg/L | 001 |
| COD | 2024 Q2 | 120 mg/L | 1400 mg/L | 002 |
| COD | 2024 Q2 | 120 mg/L | 650 mg/L | 006 |
| COD | 2024 Q1 | 120 mg/L | 140 mg/L | 001 |
| COD | 2024 Q1 | 120 mg/L | 190 mg/L | 006 |
| COD | 2023 Q4 | 120 mg/L | 360 mg/L | 001 |
| COD | 2023 Q4 | 120 mg/L | 520 mg/L | 002 |
| COD | 2023 Q4 | 120 mg/L | 370 mg/L | 006 |
| COD | 2023 Q4 | 120 mg/L | 280 mg/L | 001 |
| COD | 2023 Q4 | 120 mg/L | 440 mg/L | 002 |
| COD | 2023 Q4 | 120 mg/L | 580 mg/L | 006 |
| COD | 2023 Q3 | 120 mg/L | 360 mg/L | 001 |
| COD | 2023 Q3 | 120 mg/L | 520 mg/L | 002 |
| COD | 2023 Q3 | 120 mg/L | 370 mg/L | 006 |
| COD | 2023 Q2 | 120 mg/L | 230 mg/L | 002* |
| COD | 2023 Q2 | 120 mg/L | 180 mg/L | 006* |
| COD | 2022 Q4 | 120 mg/L | 314 mg/L | 001 |
| COD | 2022 Q4 | 120 mg/L | 295 mg/L | 002 |

be admissions for purposes of establishing civil liability.").

[37] The DMRs are a form of self-monitoring reports.

[38] The General Permit requires NELLC to sample quarterly for COD and semi-annually for all other parameters, including Oil & Grease. An asterisk (*) next to the outfall number indicates that NELLC submitted two sampling results with the same COD value at the same outfall with the same period-ending date. This table conservatively includes only one of each of those results, on the assumption that the second is a duplicate.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 12 of 38

| COD | 2022 Q4 | 120 mg/L | 359 mg/L | 006 |
|---|---|---|---|---|
| COD | 2022 Q4 | 120 mg/L | 433 mg/L | 001 |
| COD | 2022 Q4 | 120 mg/L | 424 mg/L | 002 |
| COD | 2022 Q4 | 120 mg/L | 327 mg/L | 006 |
| COD | 2022 Q3 | 120 mg/L | 314 mg/L | 001 |
| COD | 2022 Q3 | 120 mg/L | 295 mg/L | 002 |
| COD | 2022 Q3 | 120 mg/L | 359 mg/L | 006 |
| COD | 2022 Q2 | 120 mg/L | 510 mg/L | 001* |
| COD | 2022 Q2 | 120 mg/L | 1100 mg/L | 002* |
| COD | 2022 Q2 | 120 mg/L | 2300 mg/L | 006* |
| COD | 2022 Q1 | 120 mg/L | 380 mg/L | 001 |
| COD | 2022 Q1 | 120 mg/L | 730 mg/L | 002 |
| COD | 2022 Q1 | 120 mg/L | 400 mg/L | 006 |
| COD | 2021 Q4 | 120 mg/L | 130 mg/L | 002* |
| COD | 2021 Q3 | 120 mg/L | 130 mg/L | 002 |
| COD | 2021 Q2 | 120 mg/L | 300 mg/L | 001 |
| COD | 2021 Q2 | 120 mg/L | 340 mg/L | 002 |
| COD | 2021 Q2 | 120 mg/L | 300 mg/L | 006 |
| COD | 2021 Q2 | 120 mg/L | 400 mg/L | 001 |
| COD | 2021 Q2 | 120 mg/L | 400 mg/L | 002 |
| COD | 2021 Q1 | 120 mg/L | 300 mg/L | 001 |
| COD | 2021 Q1 | 120 mg/L | 340 mg/L | 002 |
| COD | 2021 Q1 | 120 mg/L | 300 mg/L | 006 |
| COD | 2020 Q4 | 120 mg/L | 360 mg/L | 001* |
| COD | 2020 Q4 | 120 mg/L | 1200 mg/L | 002* |
| COD | 2020 Q4 | 120 mg/L | 540 mg/L | 006* |
| COD | 2020 Q3 | 120 mg/L | 180 mg/L | 001 |
| COD | 2020 Q3 | 120 mg/L | 280 mg/L | 002 |
| COD | 2020 Q3 | 120 mg/L | 190 mg/L | 006 |
| COD | 2020 Q2 | 120 mg/L | 280 mg/L | 006 |
| COD | 2020 Q2 | 120 mg/L | 370 mg/L | 001* |
| COD | 2020 Q2 | 120 mg/L | 390 mg/L | 002* |
| COD | 2020 Q2 | 120 mg/L | 370 mg/L | 006 |
| COD | 2019 Q4 | 120 mg/L | 300 mg/L | 001* |
| COD | 2019 Q4 | 120 mg/L | 200 mg/L | 002* |
| COD | 2019 Q4 | 120 mg/L | 640 mg/L | 006* |
| COD | 2019 Q2 | 120 mg/L | 398 mg/L | 001 |
| COD | 2019 Q2 | 120 mg/L | 216 mg/L | 006 |
| COD | 2019 Q2 | 120 mg/L | 229 mg/L | 001 |
| COD | 2019 Q2 | 120 mg/L | 267 mg/L | 002* |
| COD | 2019 Q1 | 120 mg/L | 216 mg/L | 006 |
| COD | 2018 Q4 | 120 mg/L | 370 mg/L | 002 |
| Oil & Grease | 2024 Period 1 | 15 mg/L | 19 mg/L | 002 |

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 13 of 38

| Oil & Grease | 2022 Period 2 | 15 mg/L | 15.4 mg/L | 001 |
|---|---|---|---|---|
| Oil & Grease | 2022 Period 2 | 15 mg/L | 18 mg/L | 002 |
| Oil & Grease | 2022 Period 2 | 15 mg/L | 17.6 mg/L | 006 |
| Oil & Grease | 2020 Period 2 | 15 mg/L | 56 mg/L | 002 |
| Oil & Grease | 2019 Period 2 | 15 mg/L | 16 mg/L | 006 |

**Table 2:  Summary of Fulton Facility's Self-Reported Benchmark Exceedances (2019 Quarter 2 – 2024 Quarter 1)[39]**

| Pollutant | Year/Monitoring Period | Benchmark | Sample Concentration | Outfall |
|---|---|---|---|---|
| COD | 2024 Q1 | 120 mg/L | 290 mg/L | 001 |
| COD | 2023 Q3 | 120 mg/L | 300 mg/L | 001 |
| COD | 2023 Q2 | 120 mg/L | 260 mg/L | 001* |
| COD | 2022 Q4 | 120 mg/L | 191 mg/L | 001 |
| COD | 2022 Q4 | 120 mg/L | 700 mg/L | 001 |
| COD | 2022 Q3 | 120 mg/L | 191 mg/L | 001 |
| COD | 2022 Q2 | 120 mg/L | 480 mg/L | 001* |
| COD | 2022 Q1 | 120 mg/L | 670 mg/L | 001 |
| COD | 2021 Q4 | 120 mg/L | 160 mg/L | 001* |
| COD | 2021 Q3 | 120 mg/L | 160 mg/L | 001 |
| COD | 2020 Q4 | 120 mg/L | 1100 mg/L | 001* |
| COD | 2020 Q2 | 120 mg/L | 480 mg/L | 001* |
| COD | 2019 Q4 | 120 mg/L | 230 mg/L | 001* |
| COD | 2019 Q3 | 120 mg/L | 230 mg/L | 001 |
| COD | 2019 Q2 | 120 mg/L | 229 mg/L | 001* |
| Oil & Grease | 2021 Period 2 | 15 mg/L | 22 mg/L | 001 |
| Oil & Grease | 2020 Period 2 | 15 mg/L | 24 mg/L | 001 |
| Oil & Grease | 2019 Period 2 | 15 mg/L | 17 mg/L | 001 |

Table 1 shows that there have been at least 60 self-reported benchmark exceedances of Chemical Oxygen Demand and 6 self-reported benchmark exceedances of Oil & Grease at the Fisher Facility since 2018.  Stormwater discharges at the Fisher Facility exceeded the benchmark cutoff concentration for Chemical Oxygen Demand in the fourth quarter of 2018, three out of four quarters in 2019, three out of four quarters in 2020, all four quarters in 2021 and 2022, two out of four quarters in 2023, and both quarters that have been reported for 2024.  NELLC has

---

[39] The General Permit requires NELLC to sample quarterly for COD and semi-annually for all other parameters, including Oil & Grease.  An asterisk next to the outfall number indicates that NELLC submitted two sampling results with the same COD value at the same outfall with the same period-ending date.  This table conservatively includes only one of each of those results, on the assumption that the second is a duplicate.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 14 of 38

thus exceeded the COD benchmark at the Fisher Facility in 19 out of the past 23 quarters, and it appears that NELLC failed to sample its discharges in some of four quarters in which it did not report exceedances. In many quarters when NELLC did sample and report, there were COD exceedances at all three of the Fisher Facility's outfalls. Many of these exceedances drastically exceeded the benchmark. For example, the majority of the COD exceedances at the Fisher Facility are more than double the benchmark cutoff concentration and, at times, the facility's discharges contained between 10 and 20 times more COD than the benchmark.

Table 2 shows that there have been at least 15 self-reported benchmark exceedances of Chemical Oxygen Demand and 3 self-reported benchmark exceedances of Oil & Grease at the Fulton Facility since 2019. Stormwater discharges at the Fulton Facility exceeded the benchmark cutoff concentration for Chemical Oxygen Demand in the third quarter of 2019, two out of three quarters in 2020, two out of three quarters in 2021, all four quarters in 2022, three out of four quarters in 2023, and the first quarter of 2024. NELLC has thus exceeded the COD benchmark at the Fulton Facility in 14 out of 20 quarters, and it appears that NELLC failed to sample in some of the 6 quarters it did not report an exceedance. Exceedances at the Fulton Facility have ranged up to 9 times the benchmark cutoff concentration.

As discussed above, the Upper Bronx River is impaired due to low dissolved oxygen, yet NELLC has been discharging industrial stormwater with elevated levels of Chemical Oxygen Demand from both Facilities into the Upper Bronx River for the vast majority of more than five years. This demonstrates that NELLC does not have adequate measures at either of the Facilities to control pollutants in its stormwater.

In addition to this benchmark sampling, NELLC's visual observations of stormwater discharges at the Facilities also indicate the presence of pollution in stormwater and insufficient control measures at the Facilities. Although NELLC often failed to perform the required quarterly visual monitoring of its stormwater discharges at the Facilities (which is a violation of the General Permit's monitoring requirements, *see* Section II.F, below), when it did conduct visual monitoring NELLC reported that it observed indicators of stormwater pollution and contamination (such as color, odor, clarity, floating solids, settled solids, suspended solids, foam, or oil sheen) at the Fisher Facility in 2018, 2019, and 2022, and at the Fulton Facility in 2019.

Notifiers' review of documents submitted by NELLC to DEC and the analytical results documenting pollutant levels in stormwater discharges from the Facility well in excess of applicable benchmarks indicate that NELLC has not developed and/or implemented sufficient control measures to minimize the exposure of pollutants to stormwater, minimize the discharge of pollutants from the Facility, and otherwise comply with the non-numeric technology based effluent limitations in the General Permit.

Each discharge of stormwater from the Facility that is not subject to adequate pollution controls constitutes a separate violation of the General Permit and the Clean Water Act. In addition, NELLC has violated and will continue to violate the General Permit and the Clean Water Act on each and every day until it develops and fully and consistently implements

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 15 of 38

adequate pollution controls.

**B.      NELLC Is Violating the CWA and the General Permit by Causing or Contributing to Violations of Water Quality Standards.**

The General Permit prohibits any discharge that may cause or contribute to a violation of New York State's water quality standards.  Part II.C.1.a of the 2023 Permit states that "[i]t must be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700-705."[40]  NELLC's discharges from the Facilities cause or contribute to violations of those standards, specifically the applicable water quality standards for dissolved oxygen in the Upper Bronx River, thereby violating Part II.C.1.a of the General Permit.

As discussed above, 6 NYCRR § 703.3 provides that, for Class C non-trout waters including the Upper Bronx River, "the minimum daily average [DO concentration] shall not be less than 5.0 mg/L, and at no time shall the DO concentration be less than 4.0 mg/ L."  But the Upper Bronx River (*i.e.*, "Bronx River, Upper, and tribs") is impaired due to the failure to attain those water quality standards.  Further, the low dissolved oxygen in the Upper Bronx River is impairing the designated uses of that waterbody, such as fishing.

As set forth in Tables 1 and 2, NELLC's own stormwater sampling measured Chemical Oxygen Demand concentrations above the benchmark concentration cutoff at least 75 times since 2018, with many of these measurements many multiples and, at times, an order of magnitude above the benchmark.  Chemical Oxygen Demand is a measure of the amount of dissolved oxygen in water that will be consumed by chemical reactions (oxidation) between the water and the pollutants in NELLC's stormwater.  A high COD value indicates elevated quantities of oxygen-consuming pollutants.  Stormwater discharges with high levels of COD reduce the amount of dissolved oxygen in receiving waters, thereby contributing to hypoxic conditions.  The elevated levels of Chemical Oxygen Demand in the Facilities' stormwater discharges are evidence that NELLC is causing or contributing to the violations of the applicable water quality standards for dissolved oxygen established by DEC in the Upper Bronx River.

NELLC has violated and continues to violate the General Permit and the Clean Water Act by causing and contributing to a violation of water quality standards.  These violations are ongoing.

---

[40] *See also* 2018 Permit, Water Quality Based Effluent Limitation II.C.1.a.  *See also* 2018 Permit, Water Quality Based Effluent Limitation II.C.1.c ("any discharge which . . . may cause or contribute to a violation of water quality is prohibited").

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 16 of 38

### C. NELLC Is Violating the CWA and the General Permit by Failing to Take Required Corrective Actions.

The General Permit requires permittees to take "corrective actions" in certain instances, including when stormwater sampling results indicate benchmark exceedances or visual monitoring indicates the presence of pollution.  Part V.A of the 2023 Permit requires corrective actions when, *inter alia*, "the quarterly visual monitoring indicates the presence of pollution or when the benchmark or numeric effluent limitation monitoring sample results indicate exceedances of the pollutants."[41]  Corrective actions are also required if there is evidence indicating that stormwater discharges "are causing, have the reasonable potential to cause, or are contributing to a violation of the water quality standards."[42]  Further, corrective actions are required if a non-stormwater discharge is discovered.[43]  A failure to take the necessary and required corrective actions is a violation of the General Permit.[44]

Required corrective actions include, *inter alia*, inspecting the facility for potential sources of stormwater contamination; implementing additional non-structural and/or structural BMPs to address any sources of contamination that are identified to prevent recurrence; and revising the SWPPP in accordance with Part III.E of the General Permit.[45]  If there is an event that triggers corrective actions at an outfall that represents other substantially identical outfalls, corrective actions must be completed for all outfalls.[46]  The implementation must be completed before the next anticipated storm event, if practicable, but not more than 12 weeks after discovery (unless specific written approval for a longer schedule has been granted by DEC).[47]  If the exceedances still continue, the discharger must continue implementing additional BMPs.[48]

Permittees must also document the existence of conditions requiring corrective actions within 24 hours of becoming aware of such condition.  Permittees must keep the corrective action documentation listed in Part V.C.a-e of the General Permit with their SWPPP.[49]

---

[41] *See also* 2018 Permit, Part V.A; 2023 Permit, Part IV.E.5; 2018 Permit, Part IV.E.6.

[42] 2023 Permit, Part II.C.1.b; 2018 Permit, Part II.C.1.b.

[43] 2023 Permit, Part V.B; 2018 Permit, Part V.B.

[44] 2023 Permit, Part V; 2018 Permit, Part V.

[45] 2023 Permit, Parts V.A.1-3; *see also* 2018 Permit, Parts V.A.1-3.

[46] 2023 Permit, Part V; 2018 Permit, Part V

[47] 2023 Permit, Parts V.A.2.a-b; 2018 Permit, Parts V.A.2.a-b.

[48] 2023 Permit, Part V.A.4. 2018 Permit, Part V.A.4.

[49] 2023 Permit, Part V.C; 2018 Permit, Part V.C.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 17 of 38

NELLC has failed and continues to fail to implement sufficient corrective actions as required by the General Permit.  These violations are evidenced by the Facilities' continued stormwater sample results showing exceedances of the benchmarks and showing a reasonable potential to cause or contribute to a violation of water quality standards, as well as NELLC's observations of pollution in quarterly visual observations, as alleged above in Sections II.A-B of this Notice.

In particular, on at least one occasion NELLC reported to DEC that although its quarterly observations of stormwater discharges from the Fisher Facility revealed visual indicators of stormwater pollution and contamination, NELLC did not take any corrective actions as required by the General Permit.  On other occasions, NELLC has mentioned potential corrective actions that have either not been implemented or have not been effective to address the excess pollution in its stormwater discharges.  NELLC's Annual Certification Reports admit that the stormwater discharges at both Facilities are exceeding benchmarks for Chemical Oxygen Demand and/or Oil & Grease and discharging a Pollutant of Concern to a waterbody that is impaired by that pollution parameter (*i.e.*, the COD discharges into the DO-impaired Upper Bronx River).  Year after year, those reports repeat the same or similar statements regarding measures NELLC has taken or plans to take to address that pollution—such as, "more rigorous housekeeping activities and parking lot sweeping," "increased housekeeping," "additional housekeeping activities to lower floating and suspended solids and improve clarity and COD," "more diligent parking lot sweeping and cleaning of any specific staining in the parking lot.  However, as revealed by the continuing benchmark exceedances, NELLC's "housekeeping" and "sweeping," if actually implemented, and any other potentially corrective actions, have not addressed the stormwater pollution and do not fulfill NELLC's obligation to take corrective action.  Indeed, one "corrective action" that NELLC stated it has implemented at both Facilities—pressure washing (also referred to as power washing) the parking area—not only failed to correct the stormwater pollution problem, but itself constitutes an additional source of unlawful pollution and violates the Clean Water Act at the Facilities, as discussed in Section II.D, below.

NELLC has obviously not implemented adequate corrective actions.  NELLC is and will continue to be in ongoing and continuous violation of the corrective action requirements of the General Permit until sufficient corrective actions are implemented at both Facilities.

      **D.**      **NELLC is Violating the CWA and the General Permit by Failing to Comply with SWPPP Requirements.**

The General Permit requires that all facilities must develop and implement (*i.e.*, follow) a Stormwater Pollution Prevention Plan in accordance with general requirements and sector-specific requirements.[50]  Part III of the General Permit requires NELLC's SWPPP to "document[] the practices and procedures to ensure compliance with the conditions of [the General Permit], including the selection, design, installation and maintenance of control

---

[50] 2023 Permit, Part I.D.1.a(1); 2018 Permit, Part I.D.a.1.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 18 of 38

measures selected to meet effluent limitations in Parts II and VII."[51]  Among other things, the SWPPP must include, at a minimum: (1) information related to a facility's stormwater pollution prevention team; (2) a general site description; (3) a summary of potential pollutant sources; (4) measures related to handling of spills and releases; (5) a general location map; (6) a site map identifying the location of the facility and all receiving waters to which stormwater discharges; (7) a description of the stormwater control measures and best management practices; (8) monitoring and sampling data; (9) permit documents and correspondence with DEC; (10) inspection schedules and documentation; (11) corrective action documentation; and (12) monitoring and reporting documentation.[52]  The site map must show, among other things, "each outfall" and "[t]he approximate outline of the drainage area to each outfall."[53]

The General Permit includes sector-specific SWPPP requirements.  For facilities in Sector P, these requirements include, *inter alia*, a more detailed site map showing the locations of certain specified activities; a summary of certain additional potential pollutant sources and activities; descriptions of control measures relating to vehicle and equipment storage areas, fueling areas, material storage areas, vehicle and equipment cleaning areas, vehicle and equipment maintenance areas, among others.[54]

In addition, for facilities discharging to impaired waterbodies for which the cause of the impairment is a pollutant of concern included in the benchmarks set forth in Appendix P of the General Permit, a facility's SWPPP must include the following additional components: identification of the impaired waterbody, a list of pollutants of concern that could be discharged causing the impairment, the potential for those pollutants to be present in stormwater, and specific BMPs to minimize the pollutant of concern from being discharged to the impaired waterbody.[55]  If the SWPPP does not include this information, then discharges to an impaired waterbody are not eligible for coverage under the General Permit at all.[56]

Based on the numerous, repeated, extensive exceedances of benchmarks and reports of visual observation of pollution in stormwater, Notifiers allege that the SWPPPs for the Facilities do not comply with the General Permit and that NELLC does not implement the SWPPP correctly.  In particular, Notifiers allege that the SWPPP does not include, and NELLC has not implemented, the required minimum and industry-specific control measures necessary to reduce

---

[51] *See also* 2018 Permit, Part III.

[52] 2023 Permit, Part III.A; 2018 Permit, Part III.A.

[53] 2023 Permit, Part III.A.6.d,e; 2018 Permit, Part III.A.6.d,e.

[54] 2023 Permit, Part VII, Sector P; 2018 Permit, Part VIII, Sector P.

[55] 2023 and 2018 Permits, Part III.D.2.a-d; *see also* General Permit, Appendix F ("Pollutant(s) of Concern for Impaired Waterbodies Reference Table").

[56] 2023 and 2018 Permits, Part II.C.2.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 19 of 38

pollutant levels in discharges to BAT and BCT levels. This is evidenced by the Facilities' discharges of stormwater with pollutants at levels that exceed applicable benchmark concentrations—including Chemical Oxygen Demand, which is a pollutant of concern for the impaired Upper Bronx River—and that cause or contribute to water quality standard violations. NELLC's failures to prepare and/or implement an adequate SWPPP constitute ongoing violations of Part III the General Permit. Additionally, based on the reporting of pressure washing as a purported "corrective action," as discussed in the preceding section, Notifiers also allege that, whether or not detergent is used, the SWPPP does not include adequate documentation of this non-stormwater discharge, as required by the General Permit.

Further, the General Permit requires NELLC to keep the SWPPP current by amending it whenever there are changes in design, construction, operation, or maintenance at the Facility that affect the potential to discharge pollutants, or whenever a SWPPP's BMPs are found to be ineffective in eliminating or significantly minimizing pollutants or are otherwise not achieving the goals or requirements of the General Permit.[57] The failures to amend the SWPPP as required are also evident from the repeated statements regarded proposed corrective actions that have not been implemented or maintained. The continuing exceedances of benchmark monitoring cut-off concentrations from the Facilities indicate that such amendments have not been made or have been inadequate.

Notifiers' claim that NELLC is violating the General Permit's SWPPP requirements will be based on the broader allegation that the SWPPPs for the Facilities do not comply with the General Permit and that NELLC does not implement the SWPPP correctly. Notifiers' claim will not be limited by the more particular allegations of SWPPP deficiencies that Notifiers have included above. Notifiers seek to ensure that NELLC develops SWPPPs for both Facilities that comply with all of the General Permit's requirements and is implementing those SWPPPs correctly.

NELLC's failures to prepare and/or implement an adequate SWPPP, and to amend it based on exceedances and observations, constitute violations of the General Permit. These violations are ongoing.

E.  **NELLC Is Violating the CWA and the General Permit by Failing to Comply with Inspection, Monitoring, Reporting, and/or Recordkeeping Requirements.**

The General Permit requires that operators comply with comprehensive inspection, monitoring, reporting, and record retention requirements, as summarized here:[58]

---

[57] 2023 Permit and 2018 Permit, Part III.E.

[58] 2023 Permit and 2018 Permit, Parts IV and VI.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 20 of 38

*Facility Inspections (and Recordkeeping)*

Part IV of the General Permit obliges NELLC to conduct an annual comprehensive site inspection of the Facility that includes evaluation of areas where industrial materials or activities are exposed to stormwater.[59]  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.[60]  Records of annual comprehensive inspections must be retained as part of the SWPPP for at least five years.[61]

In addition, qualified facility personnel must carry out routine inspections at least quarterly.[62]  During these inspections, personnel must evaluate the performance of all stormwater BMPs.  The inspection must be documented, and the written record must document any deficiencies in the implementation and/or adequacy of the BMPs used at the Facility.[63]  Records of the routine inspections must be kept with the SWPPP.[64]

Qualified personnel must also complete an annual dry weather flow inspection to ensure that there are no non-stormwater discharges to the stormwater drainage system.[65]  Records of the annual dry weather flow inspection also must be retained with the SWPPP.[66]

*Visual Monitoring and Sampling of Stormwater Discharges (and Recordkeeping)*

The General Permit requires NELLC to monitor stormwater discharges from the Facility, sample those discharges, and submit complete and accurate reports to DEC.[67]

NELLC must conduct visual monitoring of stormwater discharges from each outfall at least quarterly, unless a waiver is submitted or there was no discharge during a qualifying storm event in that quarter.[68]  If the visual monitoring indicates the presence of pollution, corrective

---

[59] 2023 Permit and 2018 Permit, Part IV.A.1.

[60] *Id.*

[61] 2023 Permit and 2018 Permit, Part IV.A.2.

[62] 2023 Permit and 2018 Permit, Part IV.B.

[63] 2023 Permit and 2018 Permit, Part IV.B.2

[64] *Id.*

[65] 2023 Permit and 2018 Permit, Part IV.C.

[66] 2023 Permit and 2018 Permit, Part IV.C.4.

[67] 2023 Permit Part IV.D to IV.G, Appxs. C, D, and F. 2018 Permit Parts IV, VI, Appxs. H.8.g, H.9.

[68] 2023 Permit and 2018 Permit, Part IV.E.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 21 of 38

action is required.[69]  Records documenting the quarterly visual monitoring must be kept with the SWPPP.[70]

NELLC must also conduct visual and any other necessary screening before discharging any stormwater that accumulates in secondary containment systems.[71]  Records from monitoring of secondary containment system stormwater discharges must be kept with the SWPPP.[72]

Finally, unless a valid waiver is submitted, NELLC must also sample stormwater discharges from each outfall and compare to benchmark monitoring cut-off concentrations at least semi-annually for all parameters and at least quarterly for Chemical Oxygen Demand, because low dissolved oxygen is an impairment in the Upper Bronx River.[73]

NELLC must document storm events during which any samples are taken or visual monitoring occurs and keep this storm event documentation with the SWPPP.[74]  Laboratory sample analysis reports must also be kept with the SWPPP.[75]  The sampling results must also be submitted to DEC as a "Discharge Monitoring Report," and a copy of the Discharge Monitoring Report (DMR) must be included with the SWPPP.[76]

*Additional Recordkeeping and Reporting Requirements*

The 2023 Permit requires that the SWPPP "must be . . . retained (physically or digitally) on-site at the facility, at a different physical location or on the web."[77]

NELLC must submit reports and other required documentation to DEC on deadlines specified in the General Permit.[78]

---

[69] *Id.*

[70] 2023 Permit and 2018 Permit, Part IV.E.3.

[71] 2023 Permit and 2018 Permit, Parts IV.D.4, and IV.F.1.e.

[72] 2023 Permit and 2018 Permit, Parts IV.F.3.d.2.

[73] 2023 Permit and 2018 Permit, Part IV.F.2, Appendix F ("Pollutant(s) of Concern for Impaired Waterbodies Reference Table").

[74] 2023 Permit and 2018 Permit, Part IV.D.2.

[75] 2023 Permit and 2018 Permit, Part IV.D.3.

[76] 2023 Permit and 2018 Permit, Parts IV.F.3.d.1.

[77] 2023 Permit, Part III.C.

[78] 2023 Permit and 2018 Permit, Part VI.B.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 22 of 38

Every year, NELLC must submit an Annual Certification Report ("ACR") to DEC.  The ACR is a summary of all monitoring, inspections, corrective actions and related information performed at the facility each calendar year.[79]

Additionally, NELLC must submit Discharge Monitoring Reports (DMRs) via the U.S. EPA's electronic DMR reporting system within 28 days of the end of each monitoring period.[80]

Furthermore, every time that NELLC exceeds the benchmark cutoff concentration of an impairing pollutant of concern (chemical oxygen demand – low dissolved oxygen) in its discharges to an impaired waterbody, NELLC must also submit on DEC's Corrective Action/Non Compliance Event Form a description of the exceedance and its cause; corrective actions taken to address the exceedances; preventive correction actions taken, including any SWPPP modifications, to prevent a future exceedance; and corrective actions taken for all outfalls claiming the representative outfall waiver.[81]

NELLC does not comply with all of the foregoing requirements.

### 1.  Failure to Perform Quarterly Visual Monitoring

As noted, the General Permit requires NELLC to perform visual examinations of stormwater discharges collected from each outfall at least quarterly.[82]  NELLC is required to document its quarterly visual monitoring and include that documentation with its SWPPP.  If the visual monitoring indicates the presence of stormwater pollution, NELLC must implement corrective actions and perform an additional visual inspection following implementation the corrective actions.[83]  In violation of these General Permit requirements, NELLC failed to perform required visual examinations of its stormwater discharges at the Fisher Facility in 2019, 2021, and 2023, and at the Fulton Facility in the same years, 2019, 2021, and 2023.

### 2.  Failure to Sample Qualifying Storm Events at All Outfalls

The General Permit's benchmark sampling requirements require that "[e]ach outfall must be sampled" and that "[a] sample must be taken of the stormwater discharge resulting from a qualifying storm event with at least 0.1 inch of precipitation."[84]  A "qualifying storm event" is a

---

[79] 2023 Permit and 2018 Permit, Part VI.A.1.

[80] 2023 Permit and 2018 Permit, Part VI.A.2.a.

[81] 2023 Permit, Part VI.A.2.a(1); 2018 Permit, Part VI.A.2.b.

[82] 2023 Permit and 2018 Permit, Part IV.E.

[83] *Id*.

[84] 2023 Permit, Part IV.D.1; 2018 Permit Part IV.D.1.  *See also* 2023 Permit, Part IV.F.3.a ("Monitoring of stormwater discharges associated with industrial activity from each outfall must be performed and

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 23 of 38

defined term in the General Permit.[85]

While there is an exception to sampling each outfall for those facilities that have properly "claimed a representative outfall waiver in accordance with Part IV.G.3"—*i.e.*, claimed that two or more outfalls have substantially identical discharges—that waiver is automatically suspended "[i]f there is an event that triggers corrective actions at an outfall that represents other substantially identical outfalls."[86]  In such instance, all outfalls must once again be sampled (and all outfalls must be visually inspected) unless and until the results of two consecutive monitoring periods reported to DEC show that all outfalls have had no exceedances of benchmark monitoring cut-off concentrations for all parameters.[87]  Further, a representative outfall waiver cannot be claimed for compliance monitoring for discharges of a pollutant of concern to impaired waters. [88]

Because both Facilities discharge a pollutant of concern to an impaired water, neither facility has ever been eligible for a representative outfall waiver.[89]  Nor has NELLC been eligible for any other waiver (except possibly in early 2020 during the Covid-19 emergency).  Consequently, all of NELLC's outfalls must be sampled during qualifying storm events in each monitoring period.  However, NELLC has failed to conduct benchmark sampling on multiple occasions.  In December 2023, DEC and NELLC entered into two Orders on Consent (Nos. CO3-20231103-134 and CO3-20231103-135) due to NELLC's failure to submit discharge monitoring reports for the Facilities for the first quarter of 2023.  But that is not the only time that NELLC failed to sample its discharges, submit monitoring records, and keep such records with its SWPPP.  Notifiers allege that NELLC also failed to sample its discharges at the Fisher

---

documented. . .”); 2018 Permit, Part IV.F.3.a (same).

[85] 2023 Permit, Appendix A (definitions) (“Qualifying Storm Event – a storm event with at least 0.1 inch of precipitation (defined as a "measurable" event), providing the interval from the preceding measurable storm is at least 72 hours.  The 72-hour storm interval is waived if the preceding measurable storm did not result in a stormwater discharge (e.g., a storm events in excess of 0.1 inches may not result in a stormwater discharge at some facilities), or if the owner or operator is able to document that less than a 72 hour interval is representative for local storm events during the sampling period.”); 2018 Permit Appendix A (definitions) (same).

[86] 2023 Permit, Part IV.G.3.d, Part V; 2018 Permit, Part IV.G.3.d.  *See also* 2023 Permit, Part V (“If there is an exceedance of either a benchmark or numeric effluent limit at an outfall where a representative outfall waiver has been claimed, the waiver no longer applies and corrective actions must be performed on all outfalls covered by the waiver.”); 2018 Permit, Part V (same).

[87] 2023 Permit, Part IV.G. 3.d(3)(a); Part V; 2018 Permit, Part IV.G.3.d(3)(a).

[88] 2023 Permit and 2018 Permit, Part IV.G.3.b.

[89] Although NELLC apparently sought a representative outfall waiver on several of its NOIs for the Fisher Facility, Notifiers believe that NELLC has not submitted any Representative Outfall Waiver forms, and, even if it had, NELLC would not be eligible for such waiver at either facility.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 24 of 38

Facility in, at least, the first quarter of 2018 and the third quarter of 2019, and failed to sample its discharges at the Fulton Facility in, at least, the first quarter of 2018 and the first quarter of 2019.

### 3.    Failure to Submit Corrective Action/Non Compliance Event Forms

As noted above, every time NELLC exceeded the benchmark cutoff concentration of an impairing pollutant of concern in its discharges to an impaired waterbody, NELLC has been required to submit a Corrective Action/Non Compliance Event Form providing a description of the exceedance and its cause; corrective actions taken to address the exceedances; preventive correction actions taken, including any SWPPP modifications, to prevent a future exceedance; and corrective actions taken for all outfalls claiming the representative outfall waiver.[90]  Because NELLC has exceeded the benchmark cutoff concentration for Chemical Oxygen Demand in at least 33 quarters, it has been required to submit at least 33 Corrective Action/Non Compliance Event Forms.  Notifiers allege that NELLC has never submitted that required form, thereby violating that General Permit Requirement as well.

NELLC's failures to monitor its outfalls and to submit reports and retain monitoring data constitute violations of the General Permit.  Notifiers intend to include the inspection, monitoring, reporting and recordkeeping violations discussed above in the suit it intends to file, as well as any other inspection, monitoring, reporting, or recordkeeping violations it identifies that occur or have occurred since October 16, 2019.  Notifiers will not include the violation for failure to submit DMRs for the first quarter of 2023 in the suit they intend to file.  NELLC's failures to fully comply with the monitoring, reporting, and recordkeeping requirements of the General Permit are ongoing.

### F.    NELLC is Violating the CWA by Discharging Wastewater from the Facilities without a NPDES/SPDES Permit.

The General Permit provides coverage only for stormwater discharges and certain approved non-stormwater discharges, including "routine external building washdown and vehicle washing which does not use detergents or other compounds; [and] pavement washwaters where spills or leaks of toxic or hazardous materials, other than minor and routine releases from motor vehicles, have not occurred (unless such material has been removed) and where detergents are not used," but *only if* the SWPPP details the authorized non-stormwater discharges by, *inter alia*, identifying the discharge and the location it is likely to occur and describes appropriate BMPs for each non-stormwater source.[91]  Notifiers allege that NELLC is discharging polluted non-stormwater that is not covered by the General Permit or any other NPDES/SPDES permit.

First, Notifiers believe that NELLC washes buses at one or both Facilities using detergents or other compounds.  Such wastewater discharges are not and cannot be covered

---

[90] 2023 Permit, Part VI.A.2.a(1); 2018 Permit, Part VI.A.2.b.

[91] 2023 and 2018 Permit, Parts I.B.2, III.A.7.f; 6 NYCRR § 750-1.2(a)(29)(vi).

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 25 of 38

under the General Permit.  NELLC does not have coverage for such discharges under any other NPDES/SPDES permit.  Such discharges are therefore unpermitted and unlawful and violate the Clean Water Act.

Second, on several of its Annual Certification Reports—specifically, the reports for 2021 and 2022—NELLC noted stated it was pressure washing (power washing) the pavement at both Facilities as a purported "corrective action" to address stormwater pollution.  However, washing pavement that is suspected to contain pollutants merely accelerates the discharge of those pollutants to waters of the United States, unless the pavement washing wastewater is collected in a proper collection system and not discharged through a stormwater system or other conveyance.  Further, NELLC's discharge of pavement washing wastewater is also unpermitted and unlawful unless no detergents are used _and_ the SWPPP specifically details the pavement washing as an authorized non-stormwater discharge and describes the BMPs used to minimize pollution (such as capturing or treating the wastewater).  Instead of correcting the pollution problem, NELLC's pavement washing has exacerbated it and created an additional category of violations.

NELLC is in violation of the Clean Water Act every time discharges vehicle wash water that uses detergent or other compounds and every time it discharges pavement wash water that uses detergent and/or is not documented in the SWPPP.  Each of these violations is a separate and distinct violation of the CWA.  These violations are ongoing.

## III.

## PERSONS RESPONSIBLE FOR ALLEGED VIOLATIONS

National Express LLC and White Plains Bus Co., Inc. (collectively, NELLC) are the persons[92] responsible for the violations alleged in this Notice as the owners and/or operators of the Facilities.  As discussed above, employees of National Express LLC filed Notices of Intent to be covered by the 2018 and 2023 General Permits and most often identified the Owner/Operator as National Express LLC (NYS DOS ID 5301918), 2601 Navistar Drive, Lisle, IL 60532, while also occasionally listing the Owner/Operator as White Plains Bus Co., Inc. (NYS DOS ID 27263).  Accordingly, National Express LLC and White Plains Bus Co., Inc. are responsible for the alleged violations.

## IV.

## LOCATIONS OF THE ALLEGED VIOLATIONS

The violations alleged in this Notice have occurred and continue to occur at the Fisher Facility, which is located at 14 Fisher Lane, White Plains, New York and the Fulton Facility,

---

[92] A "person" within the meaning of the Clean Water Act includes "an individual, corporation, partnership, [or] association." CWA Section 502(5), 33 U.S.C. § 1362(5).

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 26 of 38

which is located at 91 Fulton Street, White Plains, New York.  The failures to develop and implement pollution prevention plans and take the other required measures are violations occurring at the Facilities in general and in the inadequate documents themselves.[93]

**V.**

**DATES OF VIOLATION**

The violations alleged above include unlawful discharges of pollutants, failures to implement pollution controls and corrective actions, and failures to inspect, monitor, report, and keep records.  The dates of those violations are discussed in this section.[94]

*Discharge Violations*

With respect to the discharge violations discussed above, every day that NELLC discharges industrial stormwater from either of the Facilities in violation of any condition of the General Permit, or discharges pollutants without permit authorization, is a separate violation of the Clean Water Act and/or the General Permit.  Notifiers believe that NELLC has discharged pollutants to the Upper Bronx River in violation of the General Permit on every day since February 3, 2017 (the date on which NELLC first signed and certified Notices of Intent to be covered under the General Permit), on which there has been a measurable precipitation event or discharge of previously accumulated precipitation (*i.e.*, snowmelt) over 0.1 inches.[95]  Appendix A sets forth all of those dates of stormwater discharge—392 dates in total—since October 16, 2019 (which is the start of the statute of limitations period).[96]

---

[93] The federal courts have held that a reasonably specific indication of the area where discharge or control measure violations occurred, such as the name of the facility, is sufficient, that violations for failure to prepare and implement a SWPPP, a BMP plan, and a monitoring and reporting plan are within the SWPPP, the BMP and the monitoring and reporting plans themselves, and that more precise locations need not be included in the notice.  *See, e.g.*, *NRDC v. Sw. Marine, Inc.*, 945 F. Supp. 1330, 1333 (S.D. Cal. 1996), *aff'd* 236 F.3d 985, 996 (9th Cir. 2000); *City of New York v. Anglebrook Ltd. P'ship*, 891 F. Supp. 900, 908 (S.D.N.Y. 1995); *United Anglers v. Kaiser Sand & Gravel Co.*, No. C 95-2066 CW, 1995 U.S. Dist. LEXIS 22449 at *4 (N.D. Cal. Sept. 27, 1995).

[94] With respect to the dates of violation, like the other aspects of 40 C.F.R. § 135.3 (Contents of Notice), the federal courts have explained that only "reasonable specificity" is required, *Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 488 (2d Cir. 2001), and the pre-suit notice satisfies the regulatory requirements if it allows the *recipient* to identify when the alleged violations occurred, *Paolino v. JF Realty, LLC*, 710 F.3d 31, 37 (1st Cir. 2013).

[95] EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating stormwater runoff associated with industrial activity.  *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event).

[96] The second column of Appendix A shows the amount of precipitation.  Notifiers allege that the

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 27 of 38

Accordingly, Notifiers first allege that NELLC violated the Clean Water Act by discharging stormwater associated with industrial activity without adequate pollution controls (Section II.A, above) on all 392 dates set forth in Appendix A. Additional violations will occur on stormwater discharge dates in the future, when and if the Facilities continue to discharge pollution without adequate pollution controls. Notifiers hereby give notice that they intend to include those future dates of violation, as they occur or become available, in the suit they intend to file.

Second, Notifiers allege that NELLC violated the Clean Water Act by causing or contributing to violations of water quality standards (Section II.B, above) on, *at a minimum*, all of the dates on which either the Fisher Facility or the Fulton Facility discharged stormwater containing Chemical Oxygen Demand in a concentration exceeding the benchmark cutoff. As noted above in Tables 1 and 2, such discharges occurred in, at least, the fourth quarter of 2018, all four quarters of 2019, the second, third and fourth quarters of 2020,[97] all four quarters of 2021, 2022, and 2023, and the first two quarters of 2024. Tables 1 and 2 include 75 unique samples within those quarters on which NELLC sampled COD benchmark exceedances in its stormwater discharges. While Notifiers are not aware of the precise dates on which those samples were taken (because those dates do not get reported to DEC or anyone else), NELLC is aware of those dates because it took the samples and is required to retain the sampling information. Notifiers allege that NELLC caused or contributed to a violation of water quality standards on *at least* all of the dates that NELLC discharged stormwater and collected a sample that its own laboratory results reveal exceeded the benchmark concentration cutoff for COD. If Notifiers subsequently obtain evidence that NELLC caused or contributed to a violation of water quality standards on additional dates, they will include those dates in the suit it intends to file. This includes but is not limited to future dates on which NELLC discharges stormwater and collects a sample that its own laboratory results reveal exceeds the benchmark concentration cutoff for COD.

Third, Notifiers allege that NELLC violated the Clean Water Act by discharging wastewater without a permit authorizing such discharges (Section II.F, above) on each and every date that they (i) washed vehicles using detergents or other compounds; or (ii) power washed the pavement using detergents and/or not describing the BMPs and documenting the other required information in its SWPPP. Notifiers are not aware of the precise dates on which these discharges occurred—other than NELLC's report that it was pressure washing the pavement at both Facilities in 2021 and 2022—but NELLC is aware of these dates.

---

Facilities discharged stormwater into the Upper Bronx River on each of these storm events, when either 0.1 inch of rain or 1.0 inch of snow (shown in water-equivalent inches) fell on the Facilities.

[97] NELLC did not take samples in the first quarter of 2020 due to the Covid-19 emergency.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 28 of 38

*Violations for Failures to Implement Adequate Pollution Controls, Corrective Actions, and SWPPPs*

With respect to the violations alleged in Section II.A, above, for failing to implement adequate pollution control measures (in addition to the related discharge violation), the violations alleged Section II.C, above, for failing to implement corrective actions, and the violations alleged in Section II.D, above, for failing to develop, implement, and update its SWPPPs as required by the General Permit, Notifiers alleged that each of those violations occurred in each and every day from October 16, 2019, to date, a total of 1827 days for each violation. These violations are continuing each and every day. Notifiers intend to include in the suit they intend to file, all additional dates of violation that occur until NELLC is in full compliance with those requirements.

*Monitoring, Reporting and Recordkeeping Violations*

With respect to NELLC's failures to complete necessary inspections, monitoring, recordkeeper, and reporting, as discussed above, alleged in Section II.E, above, the dates of violation are as follows.

First, NELLC failed to perform required visual examinations of its stormwater discharges at both Facilities in 2019, 2021, and 2023. Other than NELLC's admission that, at the Fulton Facility in 2019, it failed to conduct the first quarter and third quarter inspections, Notifiers are not aware of precisely which quarter(s) in each year the failures occurred. NELLC is aware of that information. In the absence of such information, Notifiers allege that the violations occurred on the last day of each quarter in 2019, 2021, 2023, *i.e.*, March 31, June 30, September 30, and December 31 of each of those years, as those are the last possible day on which the requirement could have been satisfied but was not.

Second, Notifiers allege that NELLC failed to sample its discharges at the Fisher Facility in the first quarter of 2018 and the third quarter of 2019, and failed to sample its discharges at the Fulton Facility in the first quarter of 2018 and the first quarter of 2019. Notifiers therefore allege that those violations occurred on March 31, 2018, March 31, 2019, and September 30, 2019.

Third, Notifiers allege that NELLC failed to submit 33 Corrective Action/Non Compliance Event Forms, one for each quarter it exceeded the benchmark cut off concentration for Chemical Oxygen Demand. As these forms were due one month after the end of each such quarter, Notifiers allege that these violations occurred on April 30, July 31, October 31, and January 31 of 2019, 2020, 2021, 2022, and 2023 (with the exception of April 30, 2020, when NELLC did not sample due to the Covid-19 emergency) plus January 31, April 30, and July 31 of 2024.

To the extent that Notifiers learn through discovery or otherwise that NELLC violated or continues to violate the monitoring, reporting, or recordkeeping requirements on other dates, Notifiers intend to include those dates in the suit it intends to file.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 29 of 38

Accordingly, NELLC is liable for the above-described violations occurring prior to the date of this Notice, and for every day after the date of this Notice that these violations continue. In addition to the violations set forth above, this Notice covers all violations of the Clean Water Act evidenced by information that becomes available to Notifiers after the date of this Notice.[98] These violations are ongoing and will continue until NELLC achieves full compliance with the General Permit and the Clean Water Act.

## VI.

## RELIEF REQUESTED

Notifiers will ask the Court to order NELLC to comply with the Clean Water Act, to pay penalties, and to pay Notifiers' legal fees and other litigation costs.

First, Notifiers will seek declaratory relief and injunctive relief to prevent further violations of the Clean Water Act pursuant to Sections 505(a) and (d) and such other relief as permitted by law. Notifiers will seek an order from the Court requiring NELLC to eliminate unpermitted discharges, fully comply with the General Permit, including but not limited to implementing BAT/BCT at the Facilities, preparing and implementing sufficient SWPPPs for the Facilities, taking corrective action, complying with all monitoring and reporting, and correcting all other identified violations through implementation of control measures and demonstration of full regulatory compliance.

Second, pursuant to CWA Section 309(d),[99] each separate violation of the Clean Water Act subjects NELLC to a penalty for each violation per day. Notifiers will seek the full penalties allowed by law; the current statutory maximum per violation per day is $66,712.[100]

Third, pursuant to CWA Section 505(d), Notifiers, will seek recovery of their litigation fees and costs (including reasonable attorney and expert witness fees) associated with this matter.[101]

---

[98] *See, e.g. Pub. Interest Research Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248-49 (3d Cir. 1995) (a notice that adequately identifies specific violations to a potential defendant also covers repeated and related violations that the plaintiff learns of later. "For example, if a permit holder has discharged pollutant 'x' in excess of the permitted effluent limit five times in a month but the citizen has learned only of four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered.")

[99] 33 U.S.C. § 1319(d); *see also* 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

[100] 40 C.F.R. §§ 19.2 and 19.4.

[101] 33 U.S.C. § 1365(d).

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 30 of 38

## VII.

## PERSONS GIVING NOTICE

The full name, address, and telephone number of the person giving notice are as follows:

Riverkeeper, Inc.
20 Secor Road
Ossining, NY 10562
(914) 478-4501
Attn: Victoria Leung, Esq.

Save the Sound, Inc.
1385 Boston Post Road, 2nd Floor
Larchmont, NY 10538
(914) 381-3140
Attn: Dara Illowsky, Esq.

## VIII.

## IDENTIFICATION OF COUNSEL

Notifiers are represented by legal counsel in this matter. The name, address, telephone number, and email addresses of Notifiers' attorneys are:

Reed W. Super, Esq.
Andie Altchiler, Esq.
Super Law Group, LLC
222 Broadway, 22nd Floor
New York, New York 10038
(212) 242-2355, Ext. 1
reed@superlawgroup.com

## IX.

## REQUEST FOR COPY OF SWPPP

The General Permit states:

The owner or operator must make a copy of the SWPPP available to the public within fourteen (14) days of receipt of a written request. If there is a request for a copy of the SWPPP, the owner or operator must provide a copy of the SWPPP within fourteen (14) days of receipt of the request and payment from the requestor.[102]

---

[102] 2023 Permit, Part III.C.2.c.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 31 of 38

Notifiers hereby request a copy of NELLC's SWPPP for the Fisher Facility and NELLC's SWWPP for the Fulton Facility and all of the inspection, monitoring, sampling, and related records that are part of or must be kept with those SWPPPs pursuant to the General Permit.

If you have a digital copy of your SWPPPs and the documents that are part of or must be kept with the SWPPP, please provide them by e-mail or via a file sharing service to the undersigned at reed@superlawgroup.com within fourteen days of receiving this letter. If you do not have a digital copy of your SWPPPs and will incur costs to copy or mail a paper version, please let us know (again by email to reed@superlawgroup.com) the amount of those costs and we will send you a check (or electronic payment, if you prefer).

If you fail to timely provide us with a copy of your SWPPPs as required by Part III.C.2.c of the 2023 Permit, Notifiers will include that violation in the lawsuit they intend to file.

**X.**

**CONCLUSION**

The foregoing provides more than sufficient information for NELLC to identify the specific standards, limitations, or orders alleged to have been violated, the activities alleged to constitute violations, the persons responsible for the alleged violation, the location of the alleged violations, the dates of such violation, and the full name, address, and telephone number of the person giving notice and their counsel.[103] In addition to the violations set forth above, this Notice covers all violations of the CWA evidenced by information that becomes available after the date of this Notice of Intent to File Suit.[104] Please note that Notifiers are not required to send a new notice letter in response to any effort NELLC makes to come into compliance with the Clean Water Act after receiving this letter.[105]

---

[103] 40 C.F.R. § 135.3(a).

[104] *See, e.g. Public Interest Research Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248-49 (3d Cir.1995) (a notice that adequately identifies specific violations to a potential defendant also covers repeated and related violations that the plaintiff learns of later. "For example, if a permit holder has discharged pollutant 'x' in excess of the permitted effluent limit five times in a month but the citizen has learned only of four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered.").

[105] The federal courts have held that citizens sending a notice letter is "not required to send a second notice letter in order to pursue specific claims regarding the inadequacies of Defendant's post-notice compliance efforts." *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 920 (9th Cir. 2004). *See also Sw. Marine, Inc.,* 236 F.3d at 997 (9th Cir. 2000) ("[s]ubject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant. The defendant's later changes . . . do not retroactively divest a district court of jurisdiction under 33 U.S.C. § 1365(b)."); *Anglebrook Ltd. P'ship*, 891 F. Supp. at 908 (S.D.N.Y. 1995) (plaintiff's notice letter based on inadequacies of defendant's original SWPPP held sufficient to establish court's jurisdiction, even though defendant later

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 32 of 38


        Notifiers intend to file a citizen suit under Section 505(a) of the Clean Water Act against
NELLC for the above-referenced violations upon the expiration of the 60-day notice period.
Section 505(b) requires a citizen to give notice of intent to file suit sixty days prior to the
initiation of a civil action under Section 505(a) of the Act.  During the sixty-day notice period,
Notifiers are willing to discuss effective remedies for the violations noted in this letter that may
avoid the necessity of protracted litigation.  If NELLC wishes to pursue such discussions, please
contact the undersigned attorney immediately so that negotiations may be completed before the
end of the sixty-day notice period.  We do not intend to delay the filing of a complaint in federal
court, regardless of whether discussions are continuing at the conclusion of the sixty days.


                                            Sincerely,

                                            /s/ *Reed W. Super*

                                            Reed W. Super
                                            Super Law Group, LLC
                                            222 Broadway, 22nd Floor
                                            New York, New York 10038
                                            (212) 242-2355, Ext. 1
                                            reed@superlawgroup.com

cc (via First-Class Mail):

Michael Regan, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Lisa Garcia, EPA Region 2 Administrator
Environmental Protection Agency
290 Broadway
New York, NY 10007-1866

Sean Mahar, Interim Commissioner
New York State Department of Environmental Conservation
625 Broadway
Albany, NY 12233-1011

---

prepared a revised SWPPP).

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 33 of 38

## APPENDIX A

### Rain Dates at the Facilities

### NOAA Precipitation Data
### October 16, 2019, through September 7, 2024[106]

| DATE | PRECIPITATION (INCHES) | DATE | PRECIPITATION (INCHES) |
|---|---|---|---|
| 10/16/19 | 2.56 | 12/30/19 | 0.53 |
| 10/20/19 | 0.40 | 1/3/20 | 0.11 |
| 10/22/19 | 0.50 | 1/4/20 | 0.14 |
| 10/23/19 | 0.15 | 1/16/20 | 0.11 |
| 10/27/19 | 2.20 | 1/18/20 | 0.34 |
| 10/30/19 | 0.13 | 1/25/20 | 1.20 |
| 10/31/19 | 0.76 | 2/6/20 | 0.31 |
| 11/1/19 | 0.12 | 2/7/20 | 0.34 |
| 11/7/19 | 0.12 | 2/10/20 | 0.27 |
| 11/18/19 | 0.41 | 2/11/20 | 0.29 |
| 11/19/19 | 0.38 | 2/13/20 | 0.49 |
| 11/24/19 | 0.73 | 2/27/20 | 0.53 |
| 12/1/19 | 0.58 | 3/3/20 | 0.28 |
| 12/2/19 | 0.16 | 3/6/20 | 0.10 |
| 12/9/19 | 1.25 | 3/13/20 | 0.34 |
| 12/10/19 | 0.14 | 3/17/20 | 0.11 |
| 12/11/19 | 0.25 | 3/19/20 | 0.70 |
| 12/13/19 | 0.87 | 3/23/20 | 0.79 |
| 12/14/19 | 1.06 | 3/28/20 | 0.27 |
| 12/17/19 | 0.50 | 3/29/20 | 0.36 |
| 12/29/19 | 0.30 | 4/8/20 | 0.12 |

---

[106] The rain dates in the table are all the days when 0.1 inch or more rain was observed at the nearest weather station to the Facilities (Westchester County Airport).  Rain data was accessed from the National Oceanic and Atmospheric Administration.  *Climate Data Online Search*, NAT'L OCEANIC & ATMOSPHERIC ADMIN., https://www.ncdc.noaa.gov/cdo-web/search (last visited October 16, 2024).

The most recent rain date, with 0.1 inch or more rain, available from a review of the NOAA data on October 16, 2024, is for the rain event that occurred on September 7, 2024.  Notifiers intend to include in their suit violations on any rain days that occurred after September 7, 2024, for which data was not yet available on October 16, 2024, as well as violations on rain days that occur subsequent to the mailing of this Notice.

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 34 of 38

| DATE | PRECIPITATION (INCHES) | DATE | PRECIPITATION (INCHES) |
|------|------------------------|------|------------------------|
| 4/9/20 | 0.26 | 9/28/20 | 0.10 |
| 4/13/20 | 2.58 | 9/29/20 | 0.58 |
| 4/18/20 | 0.33 | 9/30/20 | 0.97 |
| 4/21/20 | 0.23 | 10/2/20 | 0.10 |
| 4/24/20 | 0.44 | 10/12/20 | 0.52 |
| 4/26/20 | 0.21 | 10/16/20 | 1.26 |
| 4/30/20 | 0.84 | 10/28/20 | 0.27 |
| 5/1/20 | 0.20 | 10/29/20 | 1.36 |
| 5/3/20 | 0.13 | 10/30/20 | 0.49 |
| 5/8/20 | 0.53 | 11/1/20 | 0.47 |
| 5/15/20 | 0.25 | 11/11/20 | 1.07 |
| 5/23/20 | 0.54 | 11/12/20 | 0.15 |
| 6/3/20 | 0.55 | 11/13/20 | 0.10 |
| 6/5/20 | 0.51 | 11/15/20 | 0.25 |
| 6/11/20 | 0.12 | 11/23/20 | 0.43 |
| 6/28/20 | 0.55 | 11/26/20 | 0.66 |
| 7/1/20 | 0.39 | 11/30/20 | 1.31 |
| 7/3/20 | 0.75 | 12/5/20 | 0.89 |
| 7/8/20 | 0.38 | 12/14/20 | 0.11 |
| 7/10/20 | 1.22 | 12/16/20 | 0.25 |
| 7/17/20 | 1.15 | 12/31/20 | 0.33 |
| 7/22/20 | 0.60 | 1/1/21 | 0.34 |
| 7/31/20 | 1.05 | 1/15/21 | 0.36 |
| 8/3/20 | 0.38 | 1/16/21 | 0.63 |
| 8/4/20 | 0.72 | 1/26/21 | 0.12 |
| 8/7/20 | 0.11 | 2/1/21 | 0.26 |
| 8/16/20 | 0.26 | 2/7/21 | 0.15 |
| 8/17/20 | 0.86 | 2/16/21 | 0.68 |
| 8/18/20 | 0.14 | 2/18/21 | 0.30 |
| 8/19/20 | 0.12 | 2/22/21 | 0.40 |
| 8/27/20 | 0.35 | 2/27/21 | 0.35 |
| 8/28/20 | 0.18 | 2/28/21 | 0.15 |
| 8/29/20 | 0.10 | 3/1/21 | 0.14 |
| 9/1/20 | 0.37 | 3/18/21 | 0.66 |
| 9/2/20 | 0.17 | 3/24/21 | 0.53 |
| 9/3/20 | 0.79 | 3/28/21 | 0.82 |
| 9/10/20 | 0.46 | 3/31/21 | 0.38 |

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 35 of 38

| DATE | PRECIPITATION (INCHES) | DATE | PRECIPITATION (INCHES) |
|---|---|---|---|
| 4/11/21 | 0.49 | 9/17/21 | 0.13 |
| 4/12/21 | 0.24 | 9/23/21 | 0.52 |
| 4/15/21 | 1.05 | 9/24/21 | 0.59 |
| 4/21/21 | 0.39 | 9/28/21 | 0.10 |
| 4/25/21 | 0.51 | 10/4/21 | 0.54 |
| 4/28/21 | 0.11 | 10/10/21 | 0.13 |
| 5/3/21 | 0.53 | 10/16/21 | 0.23 |
| 5/4/21 | 0.54 | 10/25/21 | 0.44 |
| 5/5/21 | 0.29 | 10/26/21 | 3.91 |
| 5/9/21 | 0.64 | 10/29/21 | 0.54 |
| 5/26/21 | 0.27 | 10/30/21 | 0.11 |
| 5/28/21 | 1.21 | 11/12/21 | 0.51 |
| 5/29/21 | 0.42 | 11/13/21 | 0.37 |
| 5/30/21 | 0.84 | 11/26/21 | 0.11 |
| 6/3/21 | 0.46 | 12/6/21 | 0.30 |
| 6/4/21 | 0.10 | 12/11/21 | 0.18 |
| 6/7/21 | 0.40 | 12/22/21 | 0.13 |
| 6/8/21 | 1.55 | 12/25/21 | 0.20 |
| 6/14/21 | 0.24 | 1/1/22 | 0.47 |
| 6/19/21 | 0.87 | 1/5/22 | 0.19 |
| 6/22/21 | 0.29 | 1/7/22 | 0.18 |
| 7/1/21 | 0.71 | 1/16/22 | 0.16 |
| 7/2/21 | 1.17 | 1/17/22 | 1.24 |
| 7/3/21 | 0.10 | 1/20/22 | 0.22 |
| 7/6/21 | 0.77 | 2/3/22 | 0.53 |
| 7/8/21 | 1.42 | 2/4/22 | 0.52 |
| 7/9/21 | 0.25 | 2/17/22 | 0.23 |
| 8/8/21 | 0.16 | 2/18/22 | 0.29 |
| 8/11/21 | 0.54 | 2/22/22 | 0.26 |
| 8/19/21 | 0.31 | 2/25/22 | 0.52 |
| 8/22/21 | 2.38 | 3/6/22 | 0.13 |
| 8/23/21 | 0.97 | 3/9/22 | 0.39 |
| 9/1/21 | 6.06 | 3/12/22 | 0.21 |
| 9/2/21 | 0.10 | 3/17/22 | 0.17 |
| 9/5/21 | 0.14 | 3/19/22 | 0.14 |
| 9/9/21 | 0.56 | 3/23/22 | 0.12 |
| 9/16/21 | 0.11 | 3/24/22 | 0.59 |

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 36 of 38

| DATE | PRECIPITATION (INCHES) | DATE | PRECIPITATION (INCHES) |
|---|---|---|---|
| 3/31/22 | 0.16 | 9/6/22 | 0.85 |
| 4/1/22 | 0.35 | 9/11/22 | 0.12 |
| 4/3/22 | 0.10 | 9/12/22 | 0.20 |
| 4/6/22 | 0.28 | 9/13/22 | 2.20 |
| 4/7/22 | 3.04 | 9/22/22 | 0.48 |
| 4/8/22 | 0.16 | 9/25/22 | 0.20 |
| 4/9/22 | 0.13 | 10/1/22 | 0.24 |
| 4/14/22 | 0.13 | 10/4/22 | 0.45 |
| 4/16/22 | 0.21 | 10/5/22 | 0.63 |
| 4/18/22 | 0.61 | 10/13/22 | 0.85 |
| 4/19/22 | 0.78 | 10/17/22 | 0.12 |
| 5/2/22 | 0.15 | 10/24/22 | 0.43 |
| 5/6/22 | 0.57 | 10/31/22 | 0.10 |
| 5/7/22 | 0.52 | 11/1/22 | 0.14 |
| 5/14/22 | 0.17 | 11/11/22 | 1.36 |
| 5/16/22 | 0.12 | 11/15/22 | 0.32 |
| 5/19/22 | 0.51 | 11/16/22 | 0.13 |
| 5/20/22 | 0.18 | 11/27/22 | 0.46 |
| 5/22/22 | 0.23 | 11/30/22 | 0.80 |
| 5/27/22 | 0.12 | 12/3/22 | 0.46 |
| 5/28/22 | 0.69 | 12/6/22 | 0.68 |
| 6/1/22 | 0.40 | 12/7/22 | 0.41 |
| 6/2/22 | 0.23 | 12/15/22 | 0.56 |
| 6/8/22 | 0.15 | 12/16/22 | 0.37 |
| 6/9/22 | 0.84 | 12/22/22 | 0.21 |
| 6/12/22 | 0.21 | 12/23/22 | 0.73 |
| 6/13/22 | 0.91 | 12/31/22 | 0.34 |
| 6/16/22 | 0.35 | 1/3/23 | 0.37 |
| 6/22/22 | 0.14 | 1/6/23 | 0.20 |
| 6/23/22 | 0.12 | 1/12/23 | 0.31 |
| 6/27/22 | 0.15 | 1/19/23 | 0.76 |
| 7/18/22 | 3.44 | 1/22/23 | 0.37 |
| 8/1/22 | 0.29 | 1/23/23 | 0.28 |
| 8/7/22 | 0.12 | 1/25/23 | 1.60 |
| 8/22/22 | 0.36 | 1/26/23 | 0.40 |
| 8/30/22 | 0.23 | 2/17/23 | 0.10 |
| 9/5/22 | 0.34 | 2/21/23 | 0.15 |

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 37 of 38

| DATE | PRECIPITATION (INCHES) | DATE | PRECIPITATION (INCHES) |
|---|---|---|---|
| 2/27/23 | 0.21 | 8/15/23 | 1.20 |
| 2/28/23 | 0.22 | 8/16/23 | 0.10 |
| 3/3/23 | 0.16 | 8/18/23 | 1.63 |
| 3/4/23 | 0.88 | 8/24/23 | 0.41 |
| 3/10/23 | 0.28 | 8/25/23 | 0.58 |
| 3/11/23 | 0.23 | 8/30/23 | 0.19 |
| 3/13/23 | 0.66 | 9/8/23 | 0.22 |
| 3/14/23 | 0.34 | 9/9/23 | 0.38 |
| 3/23/23 | 0.12 | 9/10/23 | 0.82 |
| 3/25/23 | 0.18 | 9/13/23 | 0.83 |
| 3/27/23 | 0.20 | 9/18/23 | 1.51 |
| 4/1/23 | 0.62 | 9/23/23 | 0.71 |
| 4/22/23 | 0.77 | 9/24/23 | 0.49 |
| 4/23/23 | 1.31 | 9/25/23 | 0.63 |
| 4/28/23 | 0.16 | 9/28/23 | 0.48 |
| 4/29/23 | 1.69 | 9/29/23 | 4.10 |
| 4/30/23 | 2.00 | 9/30/23 | 0.15 |
| 5/2/23 | 0.22 | 10/6/23 | 0.20 |
| 5/20/23 | 1.48 | 10/7/23 | 1.37 |
| 6/6/23 | 0.20 | 10/14/23 | 0.43 |
| 6/12/23 | 0.10 | 10/20/23 | 0.59 |
| 6/14/23 | 0.24 | 10/21/23 | 0.40 |
| 7/2/23 | 0.31 | 10/29/23 | 0.61 |
| 7/3/23 | 0.10 | 10/30/23 | 0.33 |
| 7/4/23 | 0.36 | 11/7/23 | 0.23 |
| 7/9/23 | 1.84 | 11/21/23 | 0.42 |
| 7/10/23 | 0.17 | 11/22/23 | 1.42 |
| 7/14/23 | 1.02 | 11/26/23 | 0.52 |
| 7/16/23 | 0.84 | 12/1/23 | 0.26 |
| 7/18/23 | 0.24 | 12/3/23 | 0.47 |
| 7/25/23 | 0.30 | 12/10/23 | 1.06 |
| 7/29/23 | 0.79 | 12/11/23 | 0.40 |
| 8/4/23 | 0.22 | 12/17/23 | 0.27 |
| 8/7/23 | 0.75 | 12/18/23 | 2.64 |
| 8/10/23 | 0.37 | 12/27/23 | 0.29 |
| 8/12/23 | 0.77 | 12/28/23 | 1.57 |
| 8/13/23 | 0.17 | 1/6/24 | 0.22 |

Notice of Violation and Intent to File Suit
Request for SWPPP
October 16, 2024
Page 38 of 38

| DATE | PRECIPITATION (INCHES) | DATE | PRECIPITATION (INCHES) |
|---|---|---|---|
| 1/9/24 | 1.95 | 5/10/24 | 0.38 |
| 1/10/24 | 0.43 | 5/15/24 | 0.46 |
| 1/13/24 | 1.33 | 5/23/24 | 1.59 |
| 1/16/24 | 0.18 | 5/27/24 | 0.94 |
| 1/24/24 | 0.12 | 5/29/24 | 0.48 |
| 1/25/24 | 0.19 | 5/30/24 | 0.11 |
| 1/28/24 | 0.99 | 6/6/24 | 1.24 |
| 2/13/24 | 0.32 | 6/14/24 | 0.75 |
| 2/17/24 | 0.12 | 6/26/24 | 0.30 |
| 2/27/24 | 0.60 | 6/27/24 | 0.58 |
| 2/28/24 | 0.37 | 6/30/24 | 0.36 |
| 3/2/24 | 1.08 | 7/6/24 | 0.56 |
| 3/5/24 | 0.46 | 7/13/24 | 0.47 |
| 3/6/24 | 1.35 | 7/17/24 | 1.53 |
| 3/7/24 | 0.12 | 7/22/24 | 0.33 |
| 3/9/24 | 1.81 | 7/23/24 | 0.23 |
| 3/23/24 | 3.00 | 8/2/24 | 0.14 |
| 3/28/24 | 0.50 | 8/3/24 | 1.22 |
| 4/2/24 | 0.57 | 8/4/24 | 0.54 |
| 4/3/24 | 1.30 | 8/6/24 | 2.02 |
| 4/4/24 | 0.14 | 8/7/24 | 0.14 |
| 4/11/24 | 0.41 | 8/8/24 | 0.32 |
| 4/12/24 | 0.49 | 8/9/24 | 0.40 |
| 4/20/24 | 0.10 | 8/18/24 | 3.02 |
| 4/28/24 | 0.53 | 8/19/24 | 0.48 |
| 5/5/24 | 0.33 | 8/30/24 | 0.14 |
| 5/8/24 | 0.19 | 9/7/24 | 0.35 |



**UNITED STATES POSTAL SERVICE.**

CHURCH STREET
90 CHURCH ST FL 1
NEW YORK, NY 10007-9998
(800)275-8777

10/16/2024                          01:58 PM

------------------------------------------------

| Product | Qty | Unit Price | Price |
|---------|-----|-----------|-------|

------------------------------------------------

First-Class Mail®    1                    $3.15
Large Envelope
    Albany, NY 12233
    Weight: 0 lb 6.80 oz
    Estimated Delivery Date
        Sat 10/19/2024

First-Class Mail®    1                    $3.15
Large Envelope
    New York, NY 10007
    Weight: 0 lb 6.90 oz
    Estimated Delivery Date
        Fri 10/18/2024

First-Class Mail®    1                    $3.15
Large Envelope
    Washington, DC 20460
    Weight: 0 lb 6.90 oz
    Estimated Delivery Date
        Sat 10/19/2024

First-Class Mail®    1                    $3.15
Large Envelope
    New York, NY 10011
    Weight: 0 lb 7.00 oz
    Estimated Delivery Date
        Fri 10/18/2024
    Certified Mail®                       $4.85
        Tracking #:
            9589 0710 5270 2602 2239 76
    Return Receipt                        $4.10
        Tracking #:
            9590 9402 8781 4005 4883 60
Total                                    $12.10

First-Class Mail®    1                    $3.43
Large Envelope
    New York, NY 10005
    Weight: 0 lb 7.10 oz
    Estimated Delivery Date
        Fri 10/18/2024
    Certified Mail®                       $4.85
        Tracking #:
            9589 0710 5270 2602 2239 83
    Return Receipt                        $4.10
        Tracking #:
            9590 9402 8863 4005 2453 79
Total                                    $12.38

First-Class Mail®    1                    $3.43
Large Envelope
    Lisle, IL 60532
    Weight: 0 lb 7.10 oz
    Estimated Delivery Date
        Sat 10/19/2024
    Certified Mail®                       $4.85
        Tracking #:
            70172620000038019556
    Return Receipt                        $4.10
        Tracking #:
            9590 9402 8781 4005 4883 91
Total                                    $12.38

First-Class Mail®    1                    $3.15
Large Envelope
    Webster, NY 14580
    Weight: 0 lb 7.00 oz
    Estimated Delivery Date
        Sat 10/19/2024
    Certified Mail®                       $4.85
        Tracking #:
            70172620000038019563
    Return Receipt                        $4.10
        Tracking #:
            9590 9402 8781 4005 4883 84
Total                                    $12.10

First-Class Mail®    1                    $3.43
Large Envelope

```
White Plains, NY 10603
Weight: 0 lb 7.10 oz
Estimated Delivery Date
      Fri 10/18/2024              $4.85
Certified Mail®
   Tracking #:
         70172620000038018962     $4.10
Return Receipt
   Tracking #:
         9590 9402 8781 4005 4884 21
                                  $12.38
Total
                                  $3.43
First-Class Mail®    1
Large Envelope
   White Plains, NY 10606
   Weight: 0 lb 7.10 oz
   Estimated Delivery Date
      Fri 10/18/2024              $4.85
Certified Mail®
   Tracking #:
         9589 0710 5270 2039 5671 48
                                  $4.10
Return Receipt
   Tracking #:
         9590 9402 8781 4005 4884 14
Total                             $12.38

                                  $3.43
First-Class Mail®    1
Large Envelope
   Lisle, IL 60532
   Weight: 0 lb 7.10 oz
   Estimated Delivery Date
      Sat 10/19/2024              $4.85
Certified Mail®
   Tracking #:
         9589 0710 5270 1870 8218 39
                                  $4.10
Return Receipt
   Tracking #:
         9590 9402 8781 4005 4884 38
Total                             $12.38

----------------------------------------
Grand Total:                      $95.55
----------------------------------------
Credit Card Remit                 $95.55
   Card Name: VISA
   Account #: XXXXXXXXXXXXX0531
   Approval #: 05041G
   Transaction #: 141
   AID: A0000000031010        Chip
   AL: VISA CREDIT
   PIN: Not Required      CHASE VISA
----------------------------------------

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
         1-800-222-1811.

In a hurry? Self-service kiosks offer
  quick and easy check-out. Any Retail
     Associate can show you how.

        Preview your Mail
       Track your Packages
        Sign up for FREE @
 https://informeddelivery.usps.com

All sales final on stamps and postage.
 Refunds for guaranteed services only.
     Thank you for your business.

     Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device,
```



```
      or call 1-800-410-7420.

----------------------------------------

UFN: 359605-0005
Receipt #: 840-51000012-3-2956497-2
Clerk: 31
```



# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
- ☐ Return Receipt (hardcopy)         $ _____
- ☐ Return Receipt (electronic)       $ _____
- ☐ Certified Mail Restricted Delivery  $ _____
- ☐ Adult Signature Required          $ _____
- ☐ Adult Signature Restricted Delivery $ _____

Postmark Here

OCT 16 2024

CHURCH STREET STATION
NEW YORK, NY 10007

Postage

$

**Total Postage and Fees**

$

Sent To   White Plains Bus Co; Inc.

Street and Apt. No., or PO Box No.   2601 Navistar Drive

City, State, ZIP+4®   Lisle, IL 60532

**PS Form 3800, January 2023** PSN 7530-02-000-9047    **See Reverse for Instructions**



# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
## Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

**Certified Mail Fee**

$

**Extra Services & Fees** (check box, add fee as appropriate)

☐ Return Receipt (hardcopy) $ _____

☐ Return Receipt (electronic) $ _____

☐ Certified Mail Restricted Delivery $ _____

☐ Adult Signature Required $ _____

☐ Adult Signature Restricted Delivery $ _____

**Postage**

$

**Total Postage and Fees**

$

Sent To   White Plains Bu Co., Inc.

Street and Apt. No., or PO Box No.   91 fulton street

City, State, ZIP+4®   white Plains , NY 10606

PS Form 3800, January 2023 PSN 7530-02-000-9047      See Reverse for Instructions

CHURCH STREET STATION

OCT 16 2024 Postmark Here

NEW YORK, NY 10007

# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
**Domestic Mail Only**

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

White Plains, NY 10605

| | |
|---|---|
| Certified Mail Fee $4.85 | 0005 |
| $ $4.10 | 31 |
| Extra Services & Fees *(check box, add fee as appropriate)* | |
| ☐ Return Receipt (hardcopy) $ $0.00 | |
| ☐ Return Receipt (electronic) $ $0.00 | Postmark |
| ☐ Certified Mail Restricted Delivery $ $0.00 | Here |
| ☐ Adult Signature Required $ $0.00 | |
| ☐ Adult Signature Restricted Delivery $ | |
| Postage $3.43 | |
| $ | 10/16/2024 |
| Total Postage and Fees $12.38 | |
| $ | |

Sent To White Plains BVS Co., Inc.

Street and Apt. No., or PO Box No. 14 Fisher Lane

City, State, ZIP+4® White Plains, NY 10603

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
**Domestic Mail Only**

For delivery information, visit our website at *www.usps.com*®.

OFFICIAL USE

**Certified Mail Fee**

$

**Extra Services & Fees** *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)    $ _____
☐ Return Receipt (electronic)    $ _____
☐ Certified Mail Restricted Delivery    $ _____
☐ Adult Signature Required    $ _____
☐ Adult Signature Restricted Delivery $ _____

**Postage**

$

**Total Postage and Fees**

$

Sent To   Northland Express LLC

Street and Apt. No., or PO Box No.   441 Pineville Lane

City, State, ZIP+4®   Webster, NY 14580

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

CHURCH STREET STATION
OCT 16 2024
Postmark Here
NEW YORK, NY 10007

# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees (check box, add fee as appropriate)
- ☐ Return Receipt (hardcopy)         $
- ☐ Return Receipt (electronic)       $
- ☐ Certified Mail Restricted Delivery  $
- ☐ Adult Signature Required          $
- ☐ Adult Signature Restricted Delivery $

Postage

$

**Total Postage and Fees**

$

Sent To  National Express LLC

Street and Apt. No., or PO Box No.  2601 Navistar Drive

City, State, ZIP+4®  Liste, IL 60532

*Postmark: CHURCH STREET STATION OCT 16 2024 NEW YORK, NY 10007*

7017 2620 0000 3801 9556

**PS Form 3800, April 2015** PSN 7530-02-000-9047    **See Reverse for Instructions**



# U.S. Postal Service™
# CERTIFIED MAIL® RECEIPT
## Domestic Mail Only

For delivery information, visit our website at *www.usps.com*®.

OFFICIAL USE

**Certified Mail Fee**

$

**Extra Services & Fees** *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)         $ _____
☐ Return Receipt (electronic)       $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

**Postage**

$

**Total Postage and Fees**

$

Sent To    CT Corporation system for Tyler plans and co 2 Inc

Street and Apt. No., or PO Box No.    28 liberty street

City, State, ZIP+4®    New york , NY 10005

PS Form 3800, January 2023 PSN 7530-02-000-9047    See Reverse for Instructions

CHURCH STREET STATION

Postmark Here

OCT 16 2024

NEW YORK NY 10007



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

WHITE PLAINS BUS CO., INC.
14 FISHER LANE
WHITE PLAINS, NY 10603



9590 9402 8781 4005 4884 21

2. Article Number (Transfer from service label)

7017 2620 0000 0292 7707

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Brian R~3_

☑ Agent
☐ Addressee

B. Received by (Printed Name)

Brian Ramirez

C. Date of Delivery

10-21-24

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☑ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (00)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

 

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

# SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

NATIONAL EXPRESS LLC
2601 NAVISTAR DRIVE
LISLE, IL 60532



9590 9402 8781 4005 4883 91

2. Article Number (Transfer from service label)

7017 2620 0000 3801 9556

# COMPLETE THIS SECTION ON DELIVERY

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   Mail Restricted Delivery
   00)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

WFSC NMS

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt



## SENDER: *COMPLETE THIS SECTION*

- ■ **Complete items 1, 2, and 3.**
- ■ **Print your name and address on the reverse so that we can return the card to you.**
- ■ **Attach this card to the back of the mailpiece, or on the front if space permits.**

## COMPLETE THIS SECTION ON DELIVERY

**A. Signature**

X

☐ Agent
☐ Addressee

**B. Received by** *(Printed Name)*

**C. Date of Delivery**

**D. Is delivery address different from Item 1?** ☐ Yes
If YES, enter delivery address below: ☐ No

RECEIVED

OCT 21 2024

BY:

1. Article Addressed to:

CT CORPORATION SYSTEM
REGISTERED AGENT FOR
WHITE PLAINS BUS CO., INC
28 LIBERTY STREET
NEW YORK, NY 10005



9590 9402 8863 4005 2453 79

3. **Service Type**
☐ Adult Signature
☐ Adult Signature **Restricted Delivery**
☐ Certified Mail®
☐ Certified Mail **Restricted Delivery**
☐ Collect on Delivery
☐ Collect on Delivery **Restricted Delivery**
☐ _ _ Mail
☐ Mail **Restricted Delivery** (0)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail **Restricted Delivery**
☐ Signature Confirmation™
☐ Signature Confirmation **Restricted Delivery**

2. Article Number *(Transfer from service label)*

9589 0710 5270 2602 2239 83

PS Form **3811**, July 2020 PSN 7530-02-000-9053



Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

WHITE PLAINS BUS CO., INC
91 FULTON STREET
WHITE PLAINS, NY 10606



9590 9402 8781 4005 4884 14

2. Article Number (Transfer from service label)

8h 7295 6E02 0725 0740 6856

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☑ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery

10-21

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

WPBC N013

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt